EDWARD T. AUSTIN v. THE GULF, COLORADO, AND SANTA FE RAILROAD COMPANY.

1. ASSIGNMENT OF ERRORS. —The general assignment of error that "the court erred in giving judgment for the defendants instead of for the plaintiff," might be sufficient as an assignment if the error complained of involved a single question of law or one issue of fact to be determined by the weight and preponderance of the evidence in favor of one or the other party, or merely the sufficiency of the evidence as a whole to support the judgment.

2. SAME.—The court admonishes parties that the rule requiring assignments of error to be filed will be enforced.

3. CONSTITUTION—AID TO RAILROADS BY COUNTIES.—Section 32 of article 12 of the Constitution of 1869—"The inferior courts of the several counties in this State shall have the power, upon a vote of two thirds of the qualified voters of the respective counties, to assess and provide for the collection of a tax upon the taxable property to aid in the construction of internal improvements, provided that such tax shall never exceed two per cent. upon the value of such property"—was not designed to determine the character of such aid or the manner in which it should be extended, but the conditions and extent of such aid.

4. CONSTITUTIONAL LAW.—Where there is a grant of power in the Constitution to a department of Government, or to a constitutional or statutory officer, or tribunal, without defining the manner and form on or by which it is to be exercised and carried into effect, the Legislature may legitimately prescribe reasonable rules by which this may be done; and when such rules have been enacted for the proper exercise of such power, it should be exercised in conformity with such provisions.

5. SAME.—The act of April 12, 1871, entitled "An act to authorize counties, cities, and towns to aid in the construction of railroads and other works of internal improvement," prescribed the conditions and manner of extending such aid, and was constitutional.

6. SAME.—A county under such law could aid in the construction of a railroad by taking stock in the company engaged in its construction.

7. REPEAL—WHEN IT TAKES EFFECT.—An act repealing another, and not providing when it shall take effect, does not effect a repeal until sixty days from the adjournment of the Legislature.

8. CONSTRUCTION OF STATUTES.—Laws relating to the same subject, enacted during the same session of the Legislature, are to be construed together, and are ordinarily to be taken as parts of the same act.

9. SAME.—Two acts passed on the same day, identical in their enacting clauses, in one of which the excepting clause is broader than the other, must be taken as one act; and the difference in the exceptions does not produce a conflict between the acts.

10. SAME.—The exception in one of the acts of May 2, 1874, enacting that the previous act of April 22, 1874, repealing the act of April 12, 1871, should take effect from its passage, but excepting from its provisions the county of Galveston, was valid.

11. CONSTITUTIONAL LAW.—Section 17 of article 12 of the Constitution of 1869, which provides, "Every law enacted by the Legislature shall embrace but one object, and shall be expressed in its caption," discussed.

12. SAME.—A proviso excepting a county from the operation of an act altering the date at which an act, passed by the same Legislature, shall take effect, is not foreign to the purpose expressed in the caption, "An act to amend" the former act.

13. SAME.—Nor was the proviso to one of the acts of May 2, 1874, obnoxious to the objection that it revived a repealed law; the repeal did not take effect until the amendment providing that it take effect upon its passage was enacted.

14. COUNTY AID TO RAILROADS—ELECTION—POWER OF COUNTY COURT.—By section 5 of the act of 12th April, 1871, a special meeting of the County Court shall be held on the first Monday after the return day of such election, when the court shall ascertain and record the result of the election; and if two thirds of the qualified voters of the county shall have voted in favor of the proposition at such election, then it shall be the duty of the court to make such orders and adopt such regulations as will give practical effect to the proposition so voted for. Under this authority the County Court had authority, and it was the duty of the court, to ascertain whether or not two thirds of the qualified voters had voted for the proposition; to do this it had authority to use the appropriate means of informing itself, so that a correct conclusion could be reached; and it had the right to revise the list of registered voters of the county, and drop from the count names it had ascertained should be dropped from the list.

15. SAME.—Such County Court, having convened at the proper time, could adjourn from time to time, as might be necessary to perform its duty.

16. COUNTY BONDS.—County bonds may be made payable "in New York," such being within the discretion of the County Court in giving practical effect to the proposition voted for, of extending aid by county bonds to a railroad.

17. SPECIAL TAXES.—The laws levying taxes for general purposes have no reference to taxes assessed under special authority.

18. CHARTER PROVISIONS—COUNTY BONDS IN AID OF RAILROADS.—

A provision in the charter of a railroad company requiring five per cent. of its stock to be paid in, would not apply to the aid extended by counties in the construction of the road, by an exchange of county bonds for stock in the railroad company.

19. VOTE ON SUBSIDY—HOW SUBMITTED.—It was not necessary that all the details of the manner and conditions of extending aid should have been specifically submitted to a vote and have been voted upon; the substantial question to be voted upon was, "Shall the county aid in the construction of the road in the manner and to the extent provided?"

20. POWER OF COUNTY COURT.—The County Court did not exceed its authority in delivering bonds for the first five miles upon the completion of that part of the road, because it had not been "equipped and operated by steam for travel," &c. This has reference to the character of the construction of the road, and its operation was not a prerequisite to the power of the County Court in delivering the authorized bonds, on the completion of the first section of the road, as required by its charter.

APPEAL from Brazoria. Tried below before the Hon. A. P. McCormick.

E. T. Austin brought this suit in the District Court of Galveston county, on the 19th January, 1876, by petition addressed to A. P. McCormick, judge of the eighteenth judicial district, sworn to, praying an injunction to restrain the sheriff from proceeding to enforce the collection of a tax alleged to be illegally imposed on his property in Galveston county for the year 1875, amounting to $191.23, and to one third of one per cent. of the taxable property in Galveston county, and to enjoin the County Court from further assessing said tax, and from the further issue of bonds of Galveston county, claimed to have been issued in payment of a subscription of stock alleged to have been made by the County Court of Galveston county, of the Gulf, Colorado, and Santa Fe Railroad, to the amount of five hundred thousand dollars. The subscription was claimed to have been authorized by an election held on the 20th of May, 1874, in Galveston county, on a proposition from said railroad company to take said stock, which election was claimed to have been authorized by the act of the Legislature of the State of Texas.

approved April 12, 1871, and alleging the issue of $50,000 of said bonds illegally; that they were now in the hands of said railroad, and praying an injunction to prevent said railroad company from negotiating said bonds until the further order of the court in the premises, and for general relief.

All defendants accepted service; and the Gulf, Colorado, and Santa Fe Railroad Co. filed pleas and answers January 20, 1876, with a transcript of the proceedings of the County Court in the matter of the proposition and subscription to the said stock and issue of bonds and levy of tax; (which proceedings are given at large below.) That relying upon the said contract, the County Court of Galveston county elected three directors for said company, who thereafter became directors, and acted as members of the board of directors, representing the stock of said county in said company; that said company at once made a contract for the construction of more than forty miles of their railroad, beginning at Galveston; that much work had been done on said road, and an outlay of more than $300,000 expended thereon, which outlay and expense would not have been incurred but on the contract with said county; that five miles of said road, beginning at the city of Galveston, had been fully completed, and received as so completed by action of the County Court; that the County Court, upon being satisfied of the completion of said five miles, had ordered the delivery of said bonds.

The proceedings had in the County Court are as follows:

" COUNTY COURT, GALVESTON COUNTY,

" *April* 17, 1874.

" On this day came on to be heard the proposition of the Gulf, Colorado, and Santa Fe Railway Company, being desirous of securing the aid of the county of Galveston in the construction of the railway contemplated by the charter of said company; for that purpose respectfully submit for the action of your honorable body, and of the electors of said county under the Constitution and laws of the State of Texas, the following propositions:

"1st. The county of Galveston shall take and subscribe for capital stock of the Gulf, Colorado, and Santa Fe Railway Company to the amount of five hundred thousand dollars, said stock to be held by and for the exclusive use, benefit, and behoof of the county of Galveston, which shall, by reason of the ownership thereof, be entitled to all the privileges and rights enjoyed by the other stockholders in said company, and, except as hereinafter provided, shall be subject to the same duties and liabilities as other stockholders.

"2d. The amount of the subscription by the county of Galveston for the capital stock of said company, as above provided, shall be paid for in ten installments of fifty thousand dollars each.

"The said installments shall mature and become payable respectively on the completion of each five miles of the first fifty miles of said railway.

"Such completion to be in the manner provided for in the charter of said company; and upon the completion of the said first fifty miles, and the payment of the amount of said subscription by the county of Galveston, the Gulf, Colorado, and Santa Fe Railway Company shall issue to the county of Galveston a certificate of paid-up stock for the amount of said subscription.

"3d. Payments of the amount of said subscription, as above provided, shall be in cash, or bonds of the county of Galveston, at their face value; said bonds to be issued in sums of not more than $1,000 each, payable twenty-five years after date, with interest coupons attached, payable semi-annually, at the rate of ten per cent. per annum, on the face value of said bonds, and from the date until the maturity of said bonds. Bonds and coupons payable in New York, and to bear interest at the rate of ten per cent. from maturity until paid.

(Signed)           "A. SOMERVILLE, *President.*
"C. R. HUGHES, *Secretary.*

"And it appearing that said proposition is in due form of

law, and presented with a petition signed by more than fifty freeholders of Galveston county, it is therefore ordered, adjudged, and decreed that an election be held in the county of Galveston, on Wednesday, the 20th day of May, 1874, at the several election precincts, in the manner and form provided by law; and the polls shall be open from 8 o'clock a. m. to 6 o'clock p. m. of the same day, to take the opinion of the electors of said county upon said proposition. The vote on the proposition shall be by ballot: 'For the proposition,' or 'Against the proposition.'

"And it is further ordered, that this order shall be published in the " Galveston Civilian," a newspaper published in said county, for three weeks previous to said election, and the order be posted in each election precinct in the county for twenty days prior to said day fixed herein for voting on said proposition.

"And it is further ordered, that George Campbell be and he is hereby appointed manager of said election for the first election precinct; and William J. Jones, for second election precinct; W. F. Crow, for third election precinct; Fitzhugh Ward, for fourth election precinct; P. H. Hennessy, for fifth election precinct; J. M. Rogers, for sixth election precinct; R. G. Street, for seventh election precinct; Geo. L. Griscom, for eighth election precinct.

"And said managers, or any of them, shall make a return to the County Court of the result of the election, with the ballots and record of persons who voted.

                               "R. D. Johnson,
                    "*Presiding Justice, Galveston County.*


              " County Court, Galveston County,
                         "*May* 25, A. D. 1874.
"In the matter of the special election to take stock in the Gulf, Colorado, and Santa Fe Railway Company.

"The court now proceeded to open the returns from the different precincts of the county for the election held on the

20th day of May, A. D. 1874, on the proposition for the county to subscribe for capital stock of the Gulf, Colorado, and Santa Fe Railway Company to the amount of five hundred thousand dollars, and the following were declared to be the result of the election, viz:

Precinct No. 1, no return.

| | | | | | | |
|---|---|---|---|---|---|---|
| " | 2, no return. | | | | | |
| " | 3, all for the proposition, | - | - | - | | 20 |
| " | 4, " " | | - | - | - | 287 |
| " | 5, " " | | - | - | - | 791 |
| " | 6, for the proposition, | - | - | - | - | 1,186 |
| " | against the proposition, | - | - | - | | (2) |
| " | 7, for the proposition, | - | - | - | - | 761 |
| " | against the proposition, | - | - | - | | (1) |
| " | 8, for the proposition, | - | - | - | - | 17 |

Showing total for the proposition, -   -   -   -   3,062

Against the proposition, -   -   -   -   -   -   3

Majority for the proposition, -   -   -   -   -   3,059

"The registered list of voters, being brought into court, showed the total registered list of voters in the county to be 5,157.

"Colonel Flournoy then presented the following communication:

"*To the Honorable the County Court of Galveston County:*

"The petition of the Gulf, Colorado, and Santa Fe Railway Company respectfully shows that the list of general registration for the county of Galveston is not a correct statement of the qualified electors for said county; that since the greater part of said registration was completed and previous to the election of the 20th day of May, A. D. 1874, a large number of voters registered therein have died, a number have become otherwise disqualified as electors by conviction for felony, and who are now confined in the penitentiary at Huntsville, and also a large number have ceased to be citizens of Gal-

veston county by having acquired citizenship elsewhere; besides, it is respectfully submitted that a very large number of persons who purport to have been duly registered, were never citizens or qualified voters of Galveston county, and are not now such and could not now be legally registered as such.

"Petitioners respectfully invites the attention of the court to the affidavits and proofs herewith filed, and are ready to furnish such other or additional proof as your honors may require.   Petitioners claim that more than two thirds of the duly-qualified electors for Galveston county did, on the 20th day of May, A. D. 1874, vote in favor of the proposition of petitioners, and that as the statute, fifth section, act approved April 12, 1871, required this court to ascertain and record the result of said election, and if two thirds of the qualified voters of the county shall have voted in favor, &c.

"The original inquiry is, how many qualified voters are there in Galveston county?   That there is no qualified voter unless he be registered duly.   Yet, as many may have been registered who have not been or are not qualified voters, it is respectfully submitted that if proof of such fact as the names of persons so registered is submitted and credible, such persons should not and cannot be declared qualified voters.

"Petitioners pray the court to ascertain the result by first determining how many qualified voters there were in Galveston county on the day of said election, and respectfully offer to furnish any amount of proof deemed requisite in the premises.

(Signed)                                          "A. SOMERVILLE,
                                                       "R. S. WILLIS,
                                                       "D. THE. AYERS,
                                                       "M. KOPPERL,
                                                       "A. C. CRAWFORD,
                                                       "JOHN SEALY.

"The question is now presented to the court, 'Shall the list of registered voters be considered by this court as conclusive evidence of the number of qualified voters in Galveston

county for the purpose of this election?' Vote—2 yeas, 3 nays. Declared lost.

"It was then ordered that further action on this matter be laid over until Wednesday, May 27, 1874, at 1 o'clock p. m.

"COUNTY COURT, GALVESTON COUNTY,
    "*May* 27, 1874, 5 P. M.

"The court then proceeded to take up the list of registered or qualified voters, proceeding with said investigation until 6 o'clock p. m., when the court was adjourned to Tuesday, June 2, 1874, at 10 o'clock a. m.

"COUNTY COURT, GALVESTON COUNTY,
    "*June* 2, 1874, 10 A. M.

"PETITION OF E. T. AUSTIN.

"Judge E. T. Austin presented the following to the court, which was received and ordered to be filed, viz:

"THE STATE OF TEXAS, }
" *County of Galveston.* }

" The undersigned, representing, by permission of this honorable court, the qualified voters of Galveston county who opposed the proposition of The Gulf, Colorado, and Santa Fe Railway Company, by remaining away from the polls, and who are entitled to be considered as voting against said proposition in estimating the result, respectfully submits to your honorable body that in ascertaining the result of said election, outside of the returns of the election officers and the recorded list of registered voters, the board having resolved to scrutinize the said roll to ascertain the deaths, the permanent absentees, and illegal voters, the court should strike from the returns of the number of votes for the proposition all those returned by the several officers as having voted out of their proper precinct, unless the certificate of registration, accompanied by the affidavit required by the third section of an act entitled 'An act to amend an act entitled an act regulating elections,' approved March 31, 1873, being an act entitled 'An act to amend an act regulating

elections,' approved April 1, 1873, which third section reads as follows:

"'Sec. 3. Any registered voter may vote out of his precinct in his county on delivering a certificate of the registering officer or district clerk, showing him to be duly registered, and his affidavit that he is the person named; that he has not voted and will not vote elsewhere in that election, and is not absent from his precinct for the purpose of voting elsewhere, to be signed and sworn to before one of the judges of election, and with the certificate deposited with the district clerk.

"'Approved April 8, 1874.'

"And the undersigned respectfully submits, that unless the certificate of registration of each of these voters is accompanied by the affidavits required by the act, his vote was illegally admitted, and should not be estimated in counting the votes and ascertaining the result.

"And the undersigned says, that in the precinct containing the court-house, and in which were registered but 1,117 votes, 1,186 are counted as having voted for the proposition; and he says that more than half the voters who voted at this precinct voted out of their own precinct, and contrary to the law; they furnished no evidence of their right to vote out of their own precinct as required by law, and that no person was sworn as required by the statute; and he submits to the court that their votes, being illegal and without authority of law and contrary to law, should be deducted from the return of votes cast in their precinct as alleged.

(Signed) "Edward T. Austin.

" The court then proceeded to take up the list of registered or qualified voters, proceeding with said investigation until 2 p. m., when the court was adjourned until Wednesday, June 3, 1874, at 10 o'clock a. m., at which time the court proceeded to take up the registered list for the same purpose as yesterday, proceeding carefully with the investigation until 2 o'clock p. m., when the court adjourned to 12 o'clock m., Thursday, June 4, 1874.

" The court, having met and adjourned from day to day, met again on June 15, 1874, when the returns from precinct No. 1 were presented. Duplicate returns were made by the presiding officer, D. D. Waters, of the election held in precinct No. 1, on Monday, May 20, 1874, on the proposition for the county to take stock in the Gulf, Colorado, and Santa Fe Railway Company—the original returns having been made and sealed up in the ballot-box, which had been deposited in the clerk's office in due time.

" It is ordered by the court that the duplicate returns be received as the returns of said precinct, showing—

| | |
|---|---:|
| For the proposition - - - - - - - | 9 |
| Against the proposition - - - - - | 3 |
| Majority for the proposition - - - - | 6 |

"These returns being added to the returns made May 20, 1874, showing—

| | |
|---|---:|
| Majority for the proposition - - - - | 3,059 |
| Majority, precinct No. 1 - - - - - | 6 |
| Total majority for proposition - - - - | 3,065 |
| Or total number of votes for proposition - - | 3,071 |
| Or total number of votes against proposition - - | 6 |
| Leaving - - - - - - - - | 3,065 |

" When Justice Williams offered the following :

" Be it ordered by the County Court of Galveston county that the registration list as reduced by the action of the county showed that the proposition is carried by 118 votes.

"Lost; the voting standing—yeas, Williams and Pentony, 2; nays, Johnson, Kauffman, and Hancock, 3.

" The court again proceeded with the examination of the names of qualified voters, hearing evidence, and finally closed said examination.

"The following was then submitted by the presiding justice:

"In the opinion of the County Court, the proposition is carried by more than a two-thirds vote of the qualified voters of Galveston county.

"Carried by the following vote: yeas, Johnson, Hancock, and Kauffman—3; nays, Pentony and Williams—2.

\*        \*        \*        \*        \*        \*        \*        \*

"Now, therefore, on this, the day of the term, to wit, 15th day of June, 1874, it is ordered, adjudged, and decreed by the County Court in and for Galveston county, as authorized and required by law, that upon the full and entire completion of each section of five miles of said railway, according to the terms and stipulations hereinbefore recited, and according to the terms of their said charter, which full and entire completion of said each and every section of said railway for the first fifty miles thereof, first being fully and clearly established to the satisfaction of said County Court, the said County Court of Galveston county will issue and deliver, or cause to be issued and delivered, to the Gulf, Colorado, and Santa Fe Railway Company, or any one duly authorized by said company to receive the same, the sum of fifty thousand dollars ($50,000) in county bonds of the county of Galveston, payable to bearer, of the denominations of one thousand dollars ($1,000) each, and five hundred dollars ($500) each, with semi-annual interest coupons attached thereto, and bearing interest at the rate of ten per cent. per annum from the date of said bonds until paid, and said interest maturing on the 1st day of January and the 1st day of July of each and every year; and the said bonds shall be taken in said amounts at the face value, each payable twenty-five (25) years after date; and said bonds and coupons to be made payable in the city of New York, and to be duly issued by said Galveston county and registered by the comptroller of the State of Texas, as provided in said act of 12th April, 1871; and the payment of said bonds and coupons to be provided for by said County Court of Galveston

county, or in lieu of said bonds said County Court shall have full privilege of paying to said railway company the sum of fifty thousand dollars ($50,000) in United States currency, paper money, on the full and entire completion for use for each and every section of five miles of said railway to the said distance of the first fifty miles of said completed railway as aforesaid, under the said terms, conditions, and restrictions, as in case of issuance and delivery of the bonds of said county of Galveston; and that upon the completion of said first fifty miles of said Gulf, Colorado, and Santa Fe Railway, and the payment in bonds and coupons as aforesaid of the subscription of five hundred thousand dollars ($500,000) by the county of Galveston, or in cash or in ready money, as above provided for, the Gulf, Colorado, and Santa Fe Railway Company shall issue and deliver, or cause to be issued and delivered, to the said county of Galveston a certificate of paid-up stock for the amount of said subscription.

(Signed)          " R. D. JOHNSON,
*Presiding Justice Galveston County.*

" COUNTY COURT, GALVESTON COUNTY,
*" Friday, June,* 1875.

" In the matter of levying tax to provide for the payment of the principal and interest on bonds for the Gulf, Colorado, and Santa Fe Railway Company.

"Whereas this court, at former terms, orders were made authorizing the issuance to the Gulf, Colorado, and Santa Fe Railway Company of five hundred thousand dollars ($500,000) of the bonds of this county, upon certain conditions specified in said orders; and whereas this court is satisfied that said railway company will in a short time be entitled under said orders to the delivery of said bonds:

" Now, therefore, in order to provide for the payment of the principal and interest of said bonds as they become due, it is considered by the court, and so ordered and adjudged and decreed, that an annual tax of one third of one per cent. be, and the same is hereby, levied upon the assessed value of

all real and personal property situated in this county. Said tax is levied for the year 1875, and for each subsequent year, until the principal and interest of said bonds are paid.

"County Court, Galveston County,
                    "*July* 26, A. D. 1875.

"In the matter of report of Committee on Gulf, Colorado, and Santa Fe Railway Company.

"*To the Honorable County Court of Galveston, Texas:*

"A majority of your committee, who were appointed to have prepared the bonds of the county for the Gulf, Colorado, and Santa Fe Railway Company, and to examine the first five miles of said railroad, beg leave to report:

"1st. That the bonds have been prepared and are now ready to be signed and delivered as each section of said railroad is completed.

"2d. We have examined the first five miles of said railroad, and find the same fully completed.

"We would therefore recommend that $50,000 of said bonds be issued and delivered to the said Gulf, Colorado, and Santa Fe Railroad Company, in accordance with the orders of this court heretofore made.

"The presiding justice being sick, is unable to join in this report.

"All of which is respectfully submitted.

"Hugo Brosig,  }
"C. A. Kauffman, }  *Committee.*

"The foregoing report was received and approved, and the following order was made by the court:

"Whereas it has been made to appear to the satisfaction of this court that five miles of the Gulf, Colorado, and Santa Fe Railway Company have been completed; and whereas said railway company are now entitled, under orders of this court heretofore made, to receive fifty thousand dollars in the bonds of this county:

"It is therefore considered by the court, and so ordered

and decreed, that fifty thousand dollars ($50,000) of the bonds prepared under a former order of this court be signed by the presiding justice of this court, and attested by the clerk, with the seal of this court; and that fifty of said bonds, aggregating the sum of fifty thousand dollars, ($50,000,) after they have been signed and attested, be delivered by the clerk of this court to the Gulf, Colorado, and Santa Fe Railway Company.

" It is further ordered that the amount of interest that has accrued upon the bonds to date be credited upon the coupons that become due on January next.

" A communication from H. Rosenberg, president of the Gulf, Colorado, and Santa Fe Railway Company, asking that the bonds authorized by the County Court be issued to company.

" Received and filed."

The venue was changed to Brazoria county, before the same district judge.

The papers were filed in the Brazoria court January 22, 1876, and after argument the judge, on 24th January, rendered his decision refusing the injunction, and dismissed the bill, from which Austin appealed.

On the trial the defendants admitted the facts stated in the petition to be substantially true, except as to the non-completion of the five miles of road, but admitted that the road was not equipped or operated by steam power; also, that after the election the justices of the peace of Galveston county dropped from the certified registration roll of Galveston county seven hundred names of persons on said certified roll who had not voted on the proposition of the Gulf, Colorado, and Santa Fe Railroad Company, on the ground that they were not entitled to be registered.

Defendants gave in evidence the transcript of the proceedings of the County Court of Galveston county on the proposition of the company to the county to subscribe for stock in the railroad company.

The acts repealing the act of April 12, 1871, authorizing aid to railroads are as follows:

"CHAPTER XCIII.—An act to repeal an act entitled 'An act to authorize counties, cities, and towns to aid in the construction of railroads and other internal improvements,' approved April 12, 1871.

"SECTION 1. *Be it enacted by the Legislature of the State of Texas*, That an act entitled 'An act to authorize counties, cities, and towns to aid in the construction of railroads and other works of internal improvements,' approved April 12, 1871, be and the same is hereby repealed: *Provided*, That the counties of Comal, Bexar, Kendall, Bandera, Mason, Menard, Atascosa, Edwards, Wilson, Gillespie, Kerr, and Kimball shall be excepted out of the provisions of this act, and the said act, hereby repealed, shall remain in force as to said counties. Approved April 22, 1874. (Acts 14th Leg., 118.)

"CHAPTER CLVIII.—An act to amend an act approved April 22, 1874, entitled 'An act to repeal an act entitled an act to authorize counties, cities and towns to aid in the construction of railroads and other internal improvements.'

"SEC. 1. *Be it enacted by the Legislature of the State of Texas*, That the first section of the above-recited act be so amended as to read as follows: 'Section 1. That an act entitled "An act to authorize counties, cities, and towns to aid in the construction of railroads and internal improvements,"' approved April 12, 1871, be and the same is hereby repealed: *Provided*, That the counties of Comal, Bexar, Kendall, Bandera, Mason, Menard, Atascosa, Edwards, Wilson, Gillespie, Chambers, Liberty, Jefferson, Orange, Hardin, Polk, Tyler, Jasper, Newton, and Kerr shall be exempted out of the provisions of this act, and the said act, hereby repealed, shall remain in full force as to said counties: *Provided, further*, That the aforesaid act shall continue in force in the counties now comprising the 30th senatorial district: *And provided, further*, That the county of Galveston is hereby

excepted from the provisions of repeal in this act, for the purpose of holding elections and voting for or against taking and subscribing for stock in the Gulf, Colorado, and Santa Fe railroad, under and by virtue of any proposition for such subscription for stock by said companies, under the provisions of said act of April 12, 1871, which said act for said purposes shall apply and be in force and effect as to said counties last named: *Provided*, That the county of Galveston shall always have in said company a directory equivalent to the amount of stock taken by said county in said railroad.

"SEC. 2. That this act shall take effect and be in force from and after its passage.

"Presented to the Governor for approval 2d May, 1874.

"CHAPTER CLXX.—An act to amend an act approved April 22, 1874, entitled 'An act to repeal an act entitled "An act to authorize counties, cities, and towns to aid in the construction of railroads and other works of internal improvements,"' approved April 12, 1871.

"SEC. 1. *Be it enacted by the Legislature of the State of Texas*, That section one of the above-recited act be so amended as to read as follows: 'Sec. 1. That an act entitled "An act to authorize counties, cities, and towns to aid in the construction of railroads and other works of internal improvements,"' approved April 12, 1871, be and the same is hereby repealed: *Provided*, That the counties of Comal, Bexar, Kendall, Bandera, Mason, Menard, Atascosa, Edwards, Wilson, Gillespie, Kerr, Kimball, Caldwell, Gonzales, and the several counties now comprising the 30th senatorial district, shall be excepted out of the provisions of this act, and the said act, hereby repealed, shall remain in force as to the said several counties.

"SEC. 2. That this act take effect and be in force from and after its passage.

"Presented to the Governor for approval 2d May, 1874."

*Edward T. Austin*, for appellant.—Appellant insists that the effect of the acts of April 22, 1874, and of 2d May, 1874,

was to repeal the act of April 12, 1871, at least at the date of the latter repealing acts, 2d May, 1874. (Sedg. on Const. Construc., 32, 95.)

That the subsequent Legislature so construed it, is seen in the title and body of "An act for the relief of counties, &c. which have voted donations under the act of April 12, 1871, approved February 27, 1875," which title recites, "which said act was repealed April 22, 1874," and sets out in the preamble, "Whereas it is provided in the sixth section of said repealed act," &c. (Laws of 1875, p. 57.)

Our Supreme Court say, that in construing acts of the same session on the same matter, the whole must be taken as one act. (Sedg. on Const. Stat. Construc., 209.)

Let us look at the special provision in the first amendatory of act of May 2, 1874, chap. 158, for the benefit of the Gulf, Colorado, and Santa Fe Railroad. This provision or saving clause reads as follows: *"And provided further,* That Galveston county is hereby excepted from the provisions of repeal in this act, for the purpose of holding elections and voting for or against taking and subscribing for stock in the Gulf, Colorado, and Santa Fe Railroad, under and by virtue of any proposition for such subscription for stock by said companies, under the provisions of said act of April 12, 1871, which said act, for said purpose, shall apply and be in full force and effect as to said counties last named: *And provided,* The county of Galveston shall always have a directory in said company equivalent to the amount of stock taken by said county in said railroad."

Plaintiff submits that this provision is for a different object from that expressed in the title of the act of April 22, 1874, and in the titles of the amendatory acts of May 2, 1874.

The object expressed in the title of the first is to repeal the act of April 12, 1871. The object expressed in the amendatory acts is to amend the act of April 22, 1874, and amend it by making it take effect from passage.

And appellant submits that this provision is in direct con-

travention of section 17 of article 12 of the Constitution of
the State, which provides that every law passed by the Legisla-
ture shall embrace but one object, and that shall be expressed
in the title.   (See 32 Ill., 181.)

This provision of the Constitution has been held by our
Supreme Court, following the decisions in Georgia, Louis-
iana, and other States, whose constitutions have the same pro-
vision, to be mandatory.

Appellant asks the court if there is anything in the title of
the repealing act, or those amendatory of it, that would lead
one to suppose there was a special act concealed in the act for
the benefit of a particular railroad, or to legislate concerning
its directory.   The object expressed in the title of the act is
to repeal the act of April 12, 1871.   The enacting clauses
following the title repeal that act in express words; and to
show how other courts construe this provision—that so much
of the law as is not expressed in the title is void—appellant
submits the following authorities: Mayor of Savannah v. The
State, 4 Ga., 38; Sedg., 518, 520, and notes; Cool. Const.
Lim., 142 to 147; Cannon v. Hemphill, 7 Tex., 208; Par-
ker v. Parker, 10 Tex., 86; Tadlock v. Eccles, 20 Tex., 792;
Woods v. Durrett, 28 Tex., 439; Davis v. The State, 7 Md.,
159; State v. Hackett, 5 La. An., 91; 13 Mich., 494.

Appellant submits, that the intention of the Legislature in
passing the act of April 22, 1874, and the amendatory acts
thereto, was to repeal the act of April 12, 1871; that the ob-
ject expressed in the latter, and the words in the enacting
clauses of all the acts, were words of express repeal, and the
second section of both amendatory acts made the repeal take
effect from passage; and that the special provisions in the
amendatory acts for the benefit of the Gulf, Colorado, and
Santa Fe Railway be stricken out, and the act remain com-
plete, sensible, and capable of being executed; and the said
act being so repealed, the County Court acted without au-
thority of law in holding the pretended election to subscribe
for stock in said railroad and issuing said bonds; and being

so issued without authority of law, the bonds are void, into whosesoever hands they come, (19 Wall.,) and the collection of said tax and the further issue of and negotiation of said bonds should have been perpetually enjoined.

Appellant submits that the said special provision is repugnant to article 12, section 18, of the Constitution, in this: that it attempts to revive and amend an act repealed by reference to its title, instead of re-enacting it and publishing it in full. (11 La. Ann., 56.)　Article 4577 says that when one law which shall have repealed another shall itself be repealed, the former law shall not be revived without express words. (Act of January 16, 1840.)

There was no provision in the Constitution of the Republic, when this act was passed, which prohibited the revival or amendment of a law by reference to its title, and appellant submits that this provision, inserted in the Constitution of the State in 1845, and also in that of 1869, prohibits the revival of an act once repealed unless it is re-enacted and published in full.

A special law to effect this purpose of benefiting the Gulf, Colorado, and Santa Fe Railroad, could not have been got through the Legislature of 1874.　The Constitution had been amended in July, 1874, prohibiting special legislation where a general law would answer, and prohibiting special laws regulating town and county affairs; so this provision was inserted in an act intended to repeal the act of April 12, 1871, *in toto.*　(32 Ill., 181.)

II. Again, if said act of April 12, 1871, was in force when this election was held, May 20, 1874, then we construe that law, and examine the proceedings of the County Court, and compare their acts with the registration law of 1873.

On the 29th of April, 1873, the Legislature passed and the Governor approved "An act to provide for the registration of voters, and to repeal an act to provide for a special registration of voters preparatory to an election under the provisions of an act to authorize counties, cities, and towns to

aid in the construction of railroads and other works of internal improvement, approved April 12, 1871."

Section eight provides that the justices of the peace, or any three of them, shall constitute a board of revision; they shall meet at the court-house on the twelfth day before any general election, and remain in session five days, and give, during said time, their jurisdiction to hear and determine complaints against any persons who may have been improperly registered; and on the close of proceedings they must certify the precinct lists to be a true and correct list of the legal voters of precinct No. —, of Galveston county.

The district clerk enters the names so certified on the general list of voters for the county, to be certified as correct by the presiding officer of the board. Prior to any special election the district clerk may add those he has registered since the last general election.

SEC. 10. That the biennial registration hereinbefore provided for shall be deemed and held proper registration for all special elections, including those arising under the act of April 12, 1871, to authorize, &c.

A revision under the statute was held prior to the general election in 1873, when the rolls were so revised and certified to be the correct and true lists of the legal voters of Galveston county. Where did the County Court of Galveston county get the authority, between the 27th of May, 1874, and 15th of June, 1874, for a period of nineteen days, to sit in judgment on the roll of legal voters certified by the justices of the peace to be a true and correct list of legal voters, when they had jurisdiction to pass on it, and by *ex parte* testimony decide, at a time not fixed by law, that seven hundred of those who opposed the subsidy were illegally registered? (See Doss *v.* Waggoner, 3 Tex., 516.)

The court had no jurisdiction to try and determine these cases at the time these judgments purport to have been rendered. There was in fact no court in session, and no judgment could by law have been pronounced. They are not

only absolute nullities, they are not even the acts of a court.

The act of April 12, 1871, providing for proceedings after election, says: "Sec. 5. A special meeting of the County Court shall be held on the first Monday after the return day of such election, when the court shall ascertain and record the result of the election."

How? Of course by counting the votes given for or against the election.

The exhibits made part of the record by defendants, and admitted as evidence by the court below, show that said special meeting was held on the 25th day of May, 1874, to ascertain and record the result. The result is shown as follows:

| | |
|---|---:|
| For the proposition - - - - - | 3,062 |
| Against - - - - - - - | 3 |
| Majority for the proposition - - - | 3,059 |

"The registered list of voters being brought into court, showed the total registered list of voters in the county to be 5,157." Two thirds of the legal voters on the list certified to be a true and correct list had not voted for the proposition.

The act of April 12, 1871, says: "And if two thirds of the qualified voters of the county shall have voted in favor of the proposition at such election, then, and then only, the County Court can proceed further."

By ascertaining the result, the County Court saw and decided in their own minds that two thirds of the qualified voters had not voted for the proposition, by 373 votes and upwards. Appellant submits that there their duty ended.

Appellant also submits that the registration law made the certified list the legal evidence of the number of qualified voters. It was brought into court so that they might decide from it. They voted on the subject whether the certified list of voters should be considered evidence of the number of

qualified voters, only when they had been approached by the agents of the railroad company to revise the roll, so that it would seem that two thirds had voted for it. The rights of those opposed to the subscription were ignored.

The construction given to this law by lawyers, whether for or against subsidies, was that there must be an affirmative vote of two thirds of the number showing on the certified list. That the justices of the peace so construed it, that the counsel of the road before the court so construed it, is shown by the lengthy effort to reduce the list to the required number. Does this court believe that the resident male voting population of Galveston county had decreased seven hundred between October, 1873, and May, 1874? It was certified by the board of revision in October, prior to the general election in the fall of 1873, to be a correct list of the legal voters of Galveston county.

The registration law of 1873 repealed the special registration act, which made the list of specially registered, evidence of the number of legal voters, and substituted the biennial registration roll as the evidence. This roll said there were on the 25th of May, 1874, 5,157 legal voters in Galveston county entitled to be counted in estimating the result; and the County Court determined to make a rule of their own, and disfranchise seven hundred men, without due process of law.

Appellant submits that this act was *ultra vires*, and as such, the result growing out of such illegal acts, to the detriment of appellant and those he represents, who opposed said subscription by refraining from voting, as they lawfully might, should be enjoined, and that the court erred in ruling that their proceedings could not be inquired into.

This County Court refused to inquire into the qualifications of those who voted for said proposition, though, under the way the election was conducted, each man who voted for it may have voted the same day at every precinct in the city, and so, with one fourth the number voting for, could have

quadrupled their actual numbers by voting at each precinct; the very thing section 3 of the registration act was intended to prevent.

III. No five miles of said railroad were completed in accordance with its charter. See the proposition of the road: "The installment shall mature and become payable upon the completion of each five miles of the first fifty miles. Such completion to be in the manner provided for in the charter of said company."

And see the order of the so-called court, that upon the full and entire completion of each section of five miles of said railway, according to the terms and stipulations hereinbefore recited, and according to the terms of their said charter—see section 15 of charter—"that said railway shall be substantially built and fully equipped for passenger transit and for the transportation of freight, and be operated by steam in like manner as other first-class roads."

Defendants admit that the road is not equipped or operated by steam power. On this evidence the appellant submits that it is plain that the road was not entitled to receive the $50,000 of bonds under the contract, as the said completion of the five miles was not according to the terms of said charter, and that it is unlawfully in possession of said bonds, and should be required to deliver them up to be canceled.

IV. On the subject of said void and voidable bonds, plaintiff submits the following authorities:

The pretended contract, claimed to have been made by the County Court, contracts to pay the bonds and coupons in New York. This they had no right to do. (Peoria Railroad *v.* County of Tazewell, 22 Ill., 147.)

If the bonds were issued without authority, they were void; and if void, the mere levy of taxes and payment of interest would not make them valid. (38 Ill., 44; Loan Association *v.* Topeka, 20 Wall., 655.)

Where county bonds have been issued in pursuance of an election held without authority of law, as when it has been

17

ordered by a person or tribunal not authorized, they are absolutely void. (27 Ill., 305; Dillon, sec. 426 and notes; Ib., 605.)

So with counties: they are involuntary political civil divisions of the State, created by general laws to aid in the administration of the government. They are pure auxiliaries of the State; to the general statutes they owe their existence, and the statute confers on them all the powers they possess. (Dillon, sec. 10, A.)

As to the remedy to prevent the illegal imposition of a tax, and to resist the collection of an illegal tax. (Dillon, sec. 737.)

Respecting the right to restrain a corporation from collecting taxes, the courts, in cases where the relief is proper to be granted, have generally held that one or more tax-payers may bring a bill for this purpose.

If there is no power to levy the tax in question under any circumstances, a plain case for equitable interposition is made out. (Dillon, sec. 733.)

Injunction lies against a tax which is illegal, or the collection of a special tax levied without authority of law. (Hilliard on Injunc., 383.)

Courts will restrain the imposition of a tax which is illegal. (Hilliard, 388.)

The present Constitution gives the courts composed of the justices of the peace "such jurisdiction similar to that heretofore exercised by county commissioners and police courts, as may be prescribed by law." Their powers and jurisdiction are prescribed in section 33, laws of 1870, p. 108; and the regular terms are to be held on last Mondays in January, March, May, July, September, and November, and may continue three or more days.

Their power to levy taxes was limited by the act of June 3, 1873, (sec. 4 of chap. 121,) to equal to one half the State tax of fifty cents, or twenty-five cents ad valorem; and this act repealed all laws in conflict with the act which took effect from passage.

The tax against which the injunction is sought is authorized, if at all, (which appellant denies,) by the act of April 12, 1871, repealed April 22, 1874, or May 2, 1874, as the court may construe it.

The subscription for the stock cannot be enforced, because the charter requires five per cent. cash to be paid in at time of subscription, and none was paid in. The stock to Galveston county is not to be issued until five hundred thousand dollars bonds are issued and delivered. Galveston county has only an inchoate contract to take stock still to be performed. Without the law of April 12, 1871, there is no authority under the law or Constitution to authorize the County Court to become a stockholder in any railroad.

The question of levying a tax was not submitted to the qualified voters of Galveston county under the Constitution. No question of submitting to a tax of one third of one per cent., or any other amount, for twenty-five years was ever proposed. (See the proposition of a railroad; it says nothing of a tax. See the orders of the County Court; they do not contract to levy a tax.) The authority in the Constitution is not referred to in any of the proceedings, but all are based on the act of April 12, 1871, and the special clause in the act of May 2, 1874. If the question had been put before the people:—"Will you vote to allow a tax of $56,000 a year to be levied on your property for twenty-five years, in aid of this road?" it would have been rejected at once.

*Ballinger, Jack & Mott,* and *Flournoy, Sherwood & Scott* filed briefs, exhaustive in learning; their length, however, prevents insertion. Mere abstracts would not furnish the arguments.

MOORE, ASSOCIATE JUSTICE.—This suit was brought by appellant, Edward F. Austin, against the Gulf, Colorado, and Santa Fe Railroad Company; Robert D. Johnson, William H. Williams, Bradford Hancock, Hugo Brosig, and C. A. Kaufman, the justices of Galveston County Court, and Joseph

Atkins, sheriff of Galveston county, to enjoin said sheriff from collecting a tax, which had been assessed by the County Court of Galveston county, to provide a sinking fund and for payment of interest on certain bonds issued and to be issued by said county to the Gulf, Colorado, and Santa Fe Railroad Company, in pursuance of the stipulations of a contract between said County Court and said railroad company, to enjoin said justices from further assessing a tax for such purposes, and from further issuing bonds to said company; and to enjoin and restrain said Gulf, Colorado, and Santa Fe Railroad Company from negotiating and selling any of said bonds theretofore issued; and requiring said company to deliver up those already issued, to be canceled. The defendants seem to have voluntarily appeared, without the issuance of citations. They filed a general and special demurrer, and answered to the merits, denying all the material allegations in the petition.

A jury having been waived, the case was submitted to the judge of the court below, who, after hearing the petition, demurrer, answer, and evidence, refused the injunction and dismissed the petition. From this judgment the plaintiff prosecutes this appeal, on the following assignment of errors, to wit:

"1. That the court erred in refusing the injunction prayed for, and dismissing the bill.

"2. The court erred in its ruling on the law.

"3. That the court erred in its ruling on the facts.

"4. That the court erred in giving judgment for the defendants, and that the judgment should have been for the plaintiff and the perpetuation of the injunction."

An inspection of the record plainly shows that this assignment is too general and indefinite to serve the purpose for which an assignment of errors is intended, and that appellant has failed to distinctly specify in it the grounds upon which he relies for a reversal of the judgment. Taking them separately or together, they amount to no more than if ap-

pellant has said "the court erred in giving judgment for the defendants instead of for the plaintiff."

An assignment of this kind might be sufficient, if the error complained of involved a single question of law or one issue of fact to be determined by the weight and preponderance of the evidence in favor of one or the other party, or merely the sufficiency of the evidence as a whole to support the judgment. But, evidently, it cannot be so regarded where the determination of the appeal involves the consideration, as in this case, of numerous and diverse character of rulings in the court below, both in regard to matters of law and fact. And we would feel fully justified by the statute requiring an assignment of errors, and by what has been repeatedly said by the court on this subject, if we treated the case as if no errors whatever had been assigned.

But as other suits of a like character might and probably would be brought if this case should go off without our passing upon the objections taken to the validity and legality of the bonds and tax which appellant seeks to enjoin, and as both parties insist that the decisions of the questions presented by the record at as early a day as practicable is a matter of great public interest, we conclude, that we may properly regard objection to the consideration of these questions, on account of the generality of the assignment of errors, as waived. The number of cases, however, which are submitted to us on defective assignments of error of like character, notwithstanding attention has been repeatedly called to the subject, and the delay and embarrassment it necessarily occasions the court in the prompt and satisfactory disposition of business in the present over-crowded condition of our dockets, leads us to admonish parties that unless in future they use more care in the preparation of their assignments of error, they need not be surprised to find their causes disposed of by this court, without considering or passing on questions which were regarded in the court below and discussed in their briefs as of the most vital importance to their correct determination.

We are unable to say, from the record, whether the court rested its judgment on the questions of law raised by the demurrer or on the law as applicable to the facts developed on the trial, or on both. But as there was no distinct ruling upon the demurrer, unless the judgment in favor of the defendants on the issues of fact as well as those of law is correct, it should be reversed, as the defects in the petition, if any, might have been cured by amendment, if the demurrer had been ruled upon before going into trial on the issue of fact. Instead, therefore, of taking up and disposing of the questions presented by the record in the order in which they arose in the court below, we will consider the objections which have been made to the judgment by appellant, and the grounds upon which he insists it should be reversed, or such of them as are deemed essential for the proper determination of the case.

A thorough analysis of appellant's brief, in connection with the record, will show that all the objections taken by him to the judgment, which need be considered, are embraced in the following general propositions:

1. The county of Galveston was not authorized by law, on a vote of two thirds of the qualified voters of the county, to assess a tax to aid in the construction of internal improvements, or to become a stockholder in the Gulf, Colorado, and Santa Fe Railroad Company, on the 15th of June, 1874, when the contract or agreement between said company and the county, acting through the County Court, was consummated.

2. If, by law, the county of Galveston had the power and authority to aid in the construction of internal improvements, and to have entered into such a contract as that proposed to the county by said railroad company, the County Court had not been authorized by a vote of two thirds of the legal voters of the county to do so, and therefore the action of said court, accepting the proposition of the company, ordering the issuance of bonds, and assessing the tax sought to be enjoined, was unauthorized, illegal, and void.

3. Though the acceptance of the proposition made by said railroad company was valid and binding upon the county, yet said company had not fulfilled the terms and stipulations of the agreement on its part when said court delivered said bonds and assessed said tax, and therefore its action was *ultra vires*, and the injunction prayed for should have been granted.

The different propositions suggested by and discussed in appellant's brief, which, if well taken, may be claimed as tending to support these general propositions, which we have eliminated from them, will be considered in the order in which they may be suggested by our own minds, though not entirely the same in which they are discussed by appellant.

1. It seems not to be controverted, that prior to the repeal of the act of April 12, 1871, entitled "An act to authorize counties, cities, and towns to aid in the construction of railroads and other works of internal improvement," counties might, on being authorized by a vote of two thirds of the qualified voters of the county, aid in the construction of internal improvements to the extent this might be done by an assessment of a tax not to exceed two per cent. upon the taxable value of the property of the county. But it is maintained that aid could only be given to such works by a direct donation of the amount annually realized from such a tax as might be assessed for this purpose. To maintain this proposition, it must be held that the act of April 12, 1871, is in many if not all of its provisions unconstitutional, and that we must look to article 12 section 32 of the Constitution, not only to determine the power and authority by which counties and cities have to aid works of internal improvements, but also the character of such aid and the manner and form in which it is to be extended. Evidently this section of the Constitution was intended for no such purpose. Whether municipal corporations, such as counties, cities, and towns, could by virtue of their corporate authority contribute aid to, or participate in the construction of works or internal improve-

ment, and impose taxes to defray liabilities incurred thereby, and, indeed, whether the Legislature could confer upon them the power to do so, had been, previous to this provision being incorporated into our organic law, a question of great political interest and marked diversity of legal opinion. It had occasioned stubborn if not bitter and accrimonious judicial discussion. And though the legislative authority to confer such power upon corporations had been sustained in a large majority of the courts in which it had been discussed, both courts and jurists of the highest authority and of prominent learning had most emphatically announced the contrary view. It was unquestionably the intention of the framers of the Constitution to put an end to this controversy in this State, by clearly and definitely fixing the conditions upon which such power might be exercised, and the extent to which the property within the counties might be burthened by its exercise.

The language of the Constitution is: "The inferior courts of the several counties of this State shall have the power, upon the vote of two thirds of the qualified voters of the respective counties, to assess and provide for the collection of a tax upon the taxable property, to aid in the construction of internal improvements: *Provided,* That said tax shall never exceed two per cent. upon the value of such property." Now, while it is beyond question that the counties in this State, when authorized by a vote of two thirds of the qualified voters, may aid in the construction of internal improvements, certainly the manner of doing so is not attempted to be defined or settled. Shall it be done by a direct donation of money or property; by the loan of the credit of the county; by the indorsement of the bonds or contracts of the company or parties engaged in such work, or by the county becoming a stockholder or participant in the enterprise? Aid might be given in either of these ways, or in various others which might be suggested. The manner in which it shall be given, and the conditions and stipulations upon which it is done, are

unquestionably left to be determined by the municipal authorities at their own discretion, or under the guidance and direction of general or special legislation. If the former is the correct conclusion, as is insisted by one of the counsel for appellees, there is no force in this objection. In our opinion, however, the sounder conclusion is, that where there is a grant of power in the Constitution to a department of Government, or to a constitutional or statutory officer, or tribunal, without defining the manner and form on or by which it is to be exercised and carried into effect, the Legislature may legitimately prescribe reasonable rules by which this may be done. And though such power may not be taken away by the Legislature, and should it fail or refuse to legislate so as to provide for the efficient use and exercise of the power, the department, officer, or tribunal to whom it is delegated might possibly act in accordance with its own discretion, yet when the Legislature has made reasonable and appropriate provisions for its proper exercise, it should and will be exercised in conformity with such provisions.

This, we think, was done in reference to the power in question, so far as the several counties of the State are authorized to aid in the construction of internal improvements by the act of April 12, 1871, previously referred to.

If this law is a legitimate exercise of legislative authority, of which we have no doubt, and was in force at the time of the consummation of the agreement between the county of Galveston and the Gulf, Colorado, and Santa Fe Railroad Company, there can be no question that it was competent for the county to aid in the construction of said road by taking stock in said company; so, in either aspect, appellant's objection, that the county could not aid the road by taking stock, is fallacious.

But it is urged that this law had been repealed by the Legislature previous to that time. In support of this position, reference is made to an act approved April 22, 1874, and two acts passed May 2, 1874, amendatory thereof. The

act of April 22, 1874, unquestionably repeals the act of April 12, 1871, with the exception of certain counties, which are excepted out of the provisions of the act. But this act does not provide that it should take effect at any definite time. Consequently it could have no effect as a law until sixty days from the adjournment of the Legislature, which was subsequent to the acceptance by the county of Galveston of the proposition of said company to aid in the construction of said road. But it is said by the two acts passed May 2, 1874, which took effect from their passage, the act of April 22, 1874, was amended, so as to be in force from the day on which they were passed, which was prior to the day on which the vote was taken on said proposition. But these acts were passed on the same day. Under the general rule of statutory construction, laws relating to the same subject, enacted during the same session of the Legislature, are to be construed together, and are ordinarily to be taken as parts of the same act. These acts were not only passed at the same session of the Legislature, but on the same day, and relate to the same act, passed likewise at an earlier day of the same session of the Legislature. They are identical in every respect, except that the excepting clause in the one is somewhat broader than in the other. Unquestionably these acts must be construed together, and effect given to their entire provisions, if they are not in direct conflict; and if so, they would then neutralize each other. But it cannot be said, because the exceptions in the one are broader and more enlarged than in the other, that there is any such conflict between them. And the proposition for the county of Galveston to aid in the construction of said road, which was pending when they were passed, it will be seen, when we read them as one act, was expressly excepted from the operation of said act of April 12, 1871.

It is insisted, however, that this exception in the act of May 2, 1874, is inoperative and void, because this part of said act attempts to provide for a distinct and different object

from that expressed in the title of the act. (Const., art. 12, sec. 17.) This provision of the Constitution has been too frequently the subject of consideration by the courts to require now any very elaborate consideration. While it has been always held to be mandatory, it has uniformly been decided, both by this court and in the courts of those States having similar constitutional provisions, that it should receive a liberal interpretation. Judge Cooley, referring to a similar constitutional provision, says: "There has been a general disposition to construe the constitutional provision liberally, rather than to embarrass legislation by a construction whose strictness is unnecessary to the accomplishment of the beneficial purposes for which it had been adopted." (Cooley, 146, and cases there cited.)

"None of the provisions of a statute should be regarded as unconstitutional where they relate, directly or indirectly, to the same subject, have a mutual connection, and are not foreign to the subject expressed in the title." (Phillips *v.* Bridge Co., 2 Met. Ky. R., 222; Smith *v.* Commonwealth, 8 Bush., 112.)

"So long as the provisions are of the same nature, and come legitimately under one general denomination or object, we cannot say that the act is unconstitutional." (State *v.* County Judge, Davis county, 2 Iowa, 284; See also Tadlock *v.* Eccles, 20 Tex., 792; S. M. Ins. Co. *v.* New York, 5 Sand., 19.)

Applying the principles laid down in these cases, and many others to like effect to which reference might be made, we think it quite evident that the objection made to this act on this ground is not well taken.

Mere limitations and restrictions by proviso, on the general scope of the law as indicated by the body of the act, ordinarily relate and are germane to its general object, and are of general and universal use, though no references are made to them in the title of the act. To require every limitation or qualification contained in the act to be expressed in the

title, would require the title to be almost as long as the act itself. And to say that any such limitations on the general scope of a law was a distinct object from that intended by its general purposes, and therefore it could only be affected by a separate act, would tend greatly to embarrass legislation and often to defeat its real purpose. The object expressed in the title of this act is to amend a former act. The nature and character of the proposed amendment is not indicated in the title. The title can with no more propriety be said to warrant a change in the time when the amended law shall go into effect, than to except an additional country from its operation. If the law is unconstitutional in respect to one of these purposes, it surely must be so as to the other. They stand in precisely the same category. But unquestionably it is valid as to both. Neither of them are separate and distinct objects; they are both germane to, and legitimate for effectuating the objects expressed in the title.

It is also said that the exception in this act is unconstitutional, because it is an attempt "to revise and amend an act repealed, instead of re-enacting and promulgating it in full." The Constitution says, "no law shall be revised or amended by reference to its title." (Art. 12, sec. 18.) The statute of May 2, 1874, was passed in strict conformity with this requirement of the Constitution. The act of April 22, 1877, which is revised and amended, is re-enacted and published at length. No previous act is revised or attempted to be revised, if to do so would be within this provision of the Constitution. The act of April 12, 1871, was still in force, and must have continued so, without an amendment of the act of April 22, 1874, for sixty days after the adjournment of the Legislature. The object of the law of May 2 was to effect its immediate repeal, except in certain localities, and not to revise it anywhere.

2. Under the second general ground of objection to the judgment, it is claimed that two thirds of the qualified voters of Galveston county did not vote in favor of the proposition

submitted by the railroad company to said county. The vote at the election ordered by the County Court, "for the proposition," evidently was not equal to two thirds of the names on the registration list as qualified voters of Galveston county; and unless this had been the result of the election, appellant maintains that said proposition was rejected.

The act of April 12, 1871, directs, "Whenever not less than fifty freeholders of any county shall petition the County Court for an election to take the opinion of the electors of such county on a proposition that said county shall aid in the construction of a railroad or other work of internal improvement, either by taking stock, making a loan, or making a donation thereto, it shall be the duty of such County Court, at a meeting which shall be called within twenty days after the presentation of the petition, to order an election to be held in not less than thirty days nor more than forty days thereafter, to take the opinion of the electors of the county upon such proposition."

And after prescribing for notice of the election, the manner of holding and conducting it, how and when the returns are to be made, it enacts as follows: "Sec. 5. A special meeting of the County Court shall be held on the first Monday after the return day of such election, when the court shall ascertain and record the results of the election; and if two-thirds of the qualified voters of the county shall have voted in favor of the proposition at such election, then it shall be the duty of the court to make such orders and adopt such regulations as will give practical effect to the proposition so voted for," &c.

The law, we think, plainly and directly negatives the appellant's proposition. All persons duly registered are no doubt *prima facie* qualified voters, and should be admitted to vote, on the production of their certificates of registration. But it is two thirds of the qualified voters who must vote for the proposition to secure its adoption, and not two thirds of all whose names are found on the registration rolls. It is

made the duty of the court to ascertain and record the result. Evidently the court may be unable to say from a count of the vote and an inspection of the registration list whether or not two thirds of the qualified voters have voted for the proposition. Yet it is the duty of the court to do so. A matter of great importance, involving judgment and discretion, is intrusted to its determination. It necessarily follows, that the court is empowered and must resort to and use the appropriate means to inform itself and enable it to arrive at a proper and correct conclusion. It could hardly be otherwise than that the registration list of such a county as Galveston would not have upon it the names of many persons who were not at the time of the election qualified voters. The change in this respect might in a comparatively short time in some instances be so great that an unanimous vote of the qualified voters would be less than two thirds of those registered as such.

It is also claimed that the declaration of the result of the election was unauthorized and void, because made at a time when the County Court had no legal authority to sit for such purpose. But the court met at the time provided by the statute. No specific time is indicated within which it must perform the duty with which it is intrusted. It was unquestionably authorized to continue its session until it was able properly to complete and discharge its duty. The legal presumption is that it did so. We cannot presume that it violated its duty or exceeded its authority for the purpose of impeaching its acts.

Other objections are made to the action of the court in ascertaining and declaring the result of the election. If, however, we were to concede the most that can be claimed for them, it would be found that they were mere irregularities or errors in the course of a judicial proceeding, for which the judgment and conclusion could not be impeached at the time and in the manner proposed by appellant in this case.

It is also insisted that said bonds are void, because payable in New York. This was a matter properly within the discre-

tion of the County Court in giving "practical effect to the proposition voted for." It would be unreasonable to suppose that every minutiæ to this end would or could be embraced in the proposition voted on. It is also a matter which in no appreciable manner affects appellant, and a court of equity will not hear him complain of it.

The laws levying taxes for purposes of general revenue have no reference to taxes assessed under the special authority given for the levy of this tax. Consequently the act of June 3, 1873, on the subject of taxes, cannot be held to repeal it.

The objection that Galveston county did not pay five per cent. of its stock in cash at the time the proposition was accepted, is of no weight. Evidently the provision to this effect in the company's charter has no application to aid extended by counties in the construction of railroads and other works of internal improvement by an exchange of the bonds of the county for stock.

The proposition for aid by the county was submitted and voted for in strict conformity with directions and requirement of the act of April 12, 1871. Unless its provisions on the subject are shown to be illegal and void, the objection on this ground is of no force. We need not add anything further to what has already been said in reference to the constitutionality as well as construction and effect of this statute. Leaving the statute out of view, however, we see no cause to object to the form in which the proposition was submitted. The substantial question to be determined by the election was, Shall the county aid in the construction of this road in the manner and to the extent proposed? It is a poor compliment to the voters of the county to suppose that they could or did not understand the import and effect of the proposition submitted to them.

3. The railroad company stipulates that each section of five miles of the first fifty miles of its railroad shall be completed in the manner provided in the charter of the company, as a

condition precedent to the delivery to it of said bonds on each section of five miles. By its charter, the company is required "to fully equip its road for passenger-travel and for transportation of freight, and operate it by steam, in like manner as other first-class roads." It is insisted that the five miles of the road which has been inspected by the County Court, and found to be completed as stipulated in the proposition, is shown not to be operated by steam, (for passenger-travel and transportation, as we suppose;) therefore the County Court exceeded its authority in delivering to said company its bonds, and the injunction should have been for this reason granted. Evidently the stipulation in the proposition was never intended, and cannot be construed, to refer to the manner of operating this completed section of five miles of road. Obviously it had reference only to its character of construction. It could not have been supposed that it would be operated for travel or freight. The purpose of the proposition and its acceptance by the county was to aid and assist in the construction of the road, and not to retard and embarrass it by useless and idle speculations.

There is no error in the judgment, and it is affirmed.

AFFIRMED.

Justice GOULD did not sit in this case.