Ed Nichols v. The State.

*No. 606.   Decided November 4.*

1. **Confession Under Arrest—Evidence.**—Where a defendant, in arrest, after having been duly cautioned as to the consequences of any statement made by him, makes a statement or confession to the officer having him in custody, such statement or confession is legitimate evidence against him, and especially so where it appears that defendant made no issue as to his having been so cautioned.

2. **Witness, Competency of—Practice on Appeal.**—Where objection is made to the competency of a witness on account of nonage, and the further

fact, that it was not shown that said witness understood the nature and obliga-
tion of an oath, *held*, in order to have the question revised on appeal, an excep-
tion should have been taken to the ruling of the court holding the witness com-
petent.

3. **Alibi.**—The defense of alibi which is sustained by weak and unsatisfactory
testimony, which signally fails to rebut the inculpatory facts, is insufficient.

#### ON MOTION FOR REHEARING.

4. **Confessions Under Arrest, Admissibility of.**—On a trial for rape,
where the sheriff testified that he had used no persuasion, promise, or force,
and had cautioned defendant that what he said would be used against him, and
could not be used for him, which testimony the defendant did not deny, *held*,
the confession was properly admitted in evidence.

5. **Constitutional Law — Amendments to Penal Code — Suffi-
ciency of, as Respects the Title.**—Article 3, section 35, of the Constitution,
declares, that " no bill (except appropriation bills) shall contain more than one
subject, which shall be expressed in its title," etc.; and article 3, section 36, pro-
vides, that no law shall be amended by reference to its title. *Held*, that the Penal
Code and Code of Criminal Procedure of Texas, having been adopted as a single
act, designed to embrace all offenses, and the mode, manner, and punishment of
the same, and complete within itself, arranged and classified into chapters,
titles, and articles, the title of an act amending the same is sufficient, and not in
contravention of these provisions of the Constitution, if it names the article,
chapter, title, and code to be amended, without naming the crime to which the
amendment relates. Following McCracken's case, 42 Texas, 385; and Hassel-
meyer's case, 1 Texas Criminal Appeals, 690.

6. **Same— Rape — Amendment of Law as to.**—The Act of February
25, 1887, entitled "An act to amend article 528, chapter 7, title 15, of the Penal
Code," and the Act of April 13, 1891. entitled "An act to amend article 528,
chapter 7, title 15, of the Penal Code of the State of Texas, as amended by the
Act of the Twentieth Legislature, approved February 25, 1887," extending the
protection of the law of rape to females so mentally diseased as to have no will,
and changing the age of consent from 10 to 12 years, are both constitutional.

APPEAL from the District Court of Travis.    Tried below before Hon.
F. G. MORRIS.

This appeal is from a conviction for rape, the penalty having been as-
sessed by the verdict and judgment at death.

Important testimony adduced at the trial is reproduced, as follows:

Anna Straka was introduced by the State, who testified through an in-
terpreter.    Being interrogated by the court as to her competency, upon
demand of counsel of defendant, she answered as follows:   My name is
Anna Straka.   I am 11 years old; will be 11 my next birthday.   I was
born in the village of Altraham.   I came to this country about three and
a half years ago.   We lived when we first got here with my uncle, and
afterwards we moved where my father got land.   We have been living
where we now live a little over two years.   I know it is right to tell the
truth, and not to tell a lie.   I know that he meant (referring to clerk,
when he swore her) for me to tell the truth.   I do not know what will

be done to me here if I do not tell the truth. But my father and mother taught me this proverb, " One who lies in youth, will steal in old age." I will tell the truth because of —— (the interpreter explaining that it was the place of future punishment).

Examined by district attorney: My name is Anna Straka. I live about —— miles from the city of Austin, about one-fourth of a mile from Cedar Creek road, on the old Beck place, in Travis County, Texas, and I lived there in March, 1893, and on Good Friday of same year. My uncle (Volente) then lived about —— miles further from Austin, on the Cedar Creek road. On Friday, March 30, 1893, I went along the Cedar Creek road over to my uncle's. I was returning home along said road, between 5 and 6 o'clock. I did not stop on the road until I was met by a colored man, just after I crossed a hollow, and was near some hills that lie close to the road, about —— mile from where I leave the Cedar Creek road to turn off to go to my home. The place this colored man stopped me is about —— miles from where my uncle lives. The sun was behind the hills, and this spot, being towards the hollow, was darker than the other parts of the road. The colored man came near me and said something. I do not understand English, and did not understand him. I was carrying a bundle of washing in my hand. I thought he wanted to know what was in the bundle, so I began unfolding it. I was very much frightened.

The negro came up to me, threw me down, and laid on me. When he threw me down, he put his hand over my mouth so I could not cry. He unbuttoned his breeches, in front, took out his private part, and forced it in me. Then he raised up, took hold of my leg with one hand, and put his fingers in my private part, and tore my vagina into the rectum. He tore me awfully just below the belly. Yes, I would know the clothing I had on—two garments, a dress skirt and a little shirt. (Underskirt, very bloody, shown her and identified by her as the garments worn by her when she was hurt.) A great deal of blood flowed from my wounds, and flowed all down on my legs. I tried to go home. I was in very great pain. I would crawl a little piece and lie down, and in this way finally reached the near corner of the fence of the Beck place, on which I lived, where my father found me as he was driving up the cows. Sometime after dark on the same day, the defendant there was brought to my house. When I saw him he looked just the same as when he hurt me, and I recognized him by his very black face, and the same whiskers he has on his face now. The next time I saw him was in jail, and I said right away, " That is the man that hurt me." And that man there (pointing to the defendant) is certainly the man that hurt me. (Walking from the witness stand close to defendant, she looked at him and said:) He is the man, and I now see his whiskers on the side of his face, as I did them on the day he hurt me.

Cross-examined: I have lived where I now live about two years. Lived awhile about four miles from where I now live, with my aunt. I have travelled the road I was travelling when hurt, often. Since living where I do now, I have gone to my uncle's alone that road, sometimes once a week for awhile. At other times a longer period elapsed between visits. When I did go I would pass close to the house of some colored people by the name of Nichols. I have passed said house frequently in the last two years. I do not know Isaac Nichols, the old man. I do not know the Nichols family with any definiteness. They all just look black to me. I don't know their names. (Ida, Lizzie, Isaac, and Lee Nichols confronted with her, and she said) I have seen black people just like them on the gallery at different times. I sorter knew them as the Nichols family, and that they belonged to the Nichols house, but I did not know them accurately. I knew there was one big black negro man among them, who, I think, is the defendant, and I have seen him plowing in the field close to the Nichols house. I know the defendant lived at the Nichols house, but I was not familiar with his appearance. I have seen him on the gallery of the house.

On the Friday I was hurt I left my uncle's house while the sun was high, after dinner. I passed Isaac Nichols' house; the boys were eating, and did not look. I saw a negro woman on the gallery. I saw a big negro, who, I think, was defendant, and two little negroes, in the field plowing. They were plowing with three different ox teams. I did not see or hear any one after I passed the Nichols house except the defendant until my father found me. Then some one passed along the road in a buggy. The man that hurt me that day on the road was the defendant. He had on the same clothes he has on now except the pants, and the coat is the same. He had on a different shirt—a woollen shirt. I remember on the night following the afternoon I was hurt that the defendant and another man were brought before me. I knew Messrs. Muerer, Ingram, Volente, and Fowler; they and others were there. I do not know Mr. Purcell. I know Mr. Gentry; don't know whether he was there or not. At the time these two men were brought, I said Charles Cleveland was not the one. I said defendant was black, and looked like the man, and the only thing was, he looked just a little taller than I I thought he was. I did not say that the man had on a striped coat or a gray suit with a striped coat with little red and white stripes, like the one Charles Cleveland has on now and had on then; and after I had given a description of the man that hurt me and his clothes to my uncle, he did not go up and catch hold of Charles Cleveland and say this is the man. I did not say defendant was not the man, as he was too tall. I said he looked taller than I thought. He does not look too tall now. He does not look as tall as he did that night, by the dim light, in a small room, with many persons around him. When I first saw the defendant at the

place I was hurt, he was about twelve feet from me. Seeing him so suddenly and so close, so big and so black, it frightened me. His face was very black. I had seen the face before. It was the defendant. I knew him by his thin side whiskers. I did not tell Mr. Muerer the man had no whiskers, but on the contrary, I have always told about his whiskers. I did not as clearly identify defendant at my home that night, because I was lying in my bed in great pain, and he was not brought close to me, but was over by the door. I never talked with Mr. White, the sheriff, except once, through an interpreter, when I went and showed him the spot where I was raped. I have been in this country a little over two years. I can not speak English, and I do not know any little American children.

Redirect: When defendant and Charles Cleveland were brought to my house it was after dark, and before the doctor had come to relieve me. It was so dark as to necessitate a light. I was lying down in bed, in great pain on my inside. My stomach was swollen, and I was in great agony. I talked only to my uncle about the outrage and the identity of defendant at that time. I told him Charles Cleveland was not the man. I did not tell him certainly defendant was the man, because he looked a little too tall. I say defendant is the man that raped me. Everything about him tallies except his pants and shirt, and I would recognize them if I should see them. (Shirt, pants, drawers, the shirt and drawers having blood stains, defendant was wearing when arrested, exhibited, and the shirt and pants identified by witness as the ones worn by him when he raped her.)

Recross: I never was shown these things before. Defendant had them on the night he was brought to my home, when he seemed a little too tall.

Redirect: I recognized defendant when I saw him in jail as the man that was brought to my house, and as the man who raped me.

Defendant's bloody shirt, drawers, and pants, and Anna Straka's dress skirt and shirt, underskirt—the clothing worn by defendant and Anna Straka respectively—put in evidence.

James Fowler, for the State, testified as follows: My name is James Fowler. Friday, March 30, A. D. 1893, I was constable of precinct number 1, Travis County, Texas. I was also a deputy sheriff. The rape with which defendant is charged was committed on Friday, March 30, A. D. 1893. The place where the rape was committed was pointed out while I was present, by Anna Straka, and is in Travis County, Texas. I received information in reference to the rape Friday night about 12 o'clock, and went at once to Anna Straka's house. She was lying on the bed, suffering greatly; was nervous, and seemed prostrated. I got a description of the man who committed the rape, through an interpreter.

I immediately went to Mr. Richards' house, looking for the defendant.

Defendant lives upon the Richards place. Defendant was not there, so I went over to the house of Jose Maria, on the Cedar Creek road, between the Nichols house and the place of rape. I went from there to the Nichols house for the purpose of examining the defendant, his clothes, and person. I got there about 2 a. m. Rapped at the door. Called for defendant. After parleying, and getting Mr. Richards to come up, I finally got in and called for his boys. I found defendant in west room, and took him into the east room, and began an examination of his person and clothes. I was looking for blood. I could not make a satisfactory examination for lack of sufficient light, so I started with defendant for the Straka house. On the way I went by the house of Andy Cleveland, and arrested Charley Cleveland and took him along, too. I placed both before the little girl, and conversed through Messrs. Volente and Muerer.

I left defendant under guard of Mr. Purcell, and then went off about two miles, and arrested a third man, but did not carry him to the Straka house. After daylight, I went with a number of men to the scene of the outrage, and tried to find tracks, but could find none. We then looked for water, as we supposed whoever committed the outrage would want to wash. We found a water hole, just south of the road a piece, and tracks in its edge, near the water, as if a man had squatted over the hole. The person who made those tracks, when he left the water hole, walked plum towards where defendant lived, and we could trace the tracks some little piece, until they were lost in the higher and harder ground. I went back to the Straka house for defendant's shoes. I fitted them to the tracks, and they fitted exactly. The shoes that made the tracks went so deep into the mud as to leave not only a track, but also an impression of the vamps and heels of the shoes; there was mud on the vamps and heels of the shoes corresponding with the impression on the mud. The mud in the water hole and that on the defendant's shoes was of the same color and character. The water hole was about three hundred steps from the place of rape; it was stepped off.

I then returned to the Straka residence, and Stark Washington, Ben Templeton, and I took defendant out behind the barn to examine him. I did not lift up his shirt and look at it carefully. Found blood-stains on defendant's pants and drawers right at the opening over his privates. I examined his shirt on the Saturday morning following the day upon which the offense was committed, after defendant took it off in the jail, and found it stained in front with blood, just above where it would be over his private parts. (Witness being handed the pants, drawers, and shirt of defendant, examined same, and said:) The pants and drawers had blood-stains right along the edge of the opening to the privates, just as they did when he first examined them, at Straka's house. That shirt still had the blood-stains, he said, when taken off defendant in the jail the day after the day the rape was committed.

Cross-examined:   It is between six and seven miles between my house and Straka's.   I rode the distance in a gallop.   I think I must have got there about 1 a. m.   There was already a good many men there.   I stayed there about three-quarters of an hour, then went to Mr. Richards'; woke him up; he stayed at home.   There were about six or seven men with me when I got to Nichols' house.   They had followed along with me from Straka's.   Messrs. Ingram, Muerer, and others were with me.   I placed men around the house, so as to surround it, and went up and knocked at the door.   When I knocked, old man Wilson answered.   He did not come to the door or unfasten it.   He would not let me in.   I asked him if he did not know me, Fowler, and that I was an officer.   He said he had never heard of me.   I finally got Mr. Richards, and after about an hour and a half got in.   Defendant came towards me out of west room, with the drawers I have been testifying about on, and the pants in his hands.   I took him in east room to examine him, but could make no satisfactory examination.   I then started to Straka's house with defendant.   None of the colored people were following me.   I went to Cleveland's house and arrested Charles Cleveland.   Isaac Nichols came up while we were there, and Isaac Nichols and Andy Cleveland got over to Straka's soon after I did.   I took Charley Cleveland and defendant before Anna Straka at once.   She did not point her finger at any one as the man who ravished her.

I arrested both of these men because I wanted to find out who ravished the little girl.   I turned Charles Cleveland loose next morning, after finding blood on defendant's clothes and finding the tracks in the water hole, and examining defendant's shoes and fitting them to the tracks.   I can not say the man who made the tracks at the water hole was stooping; the tracks looked like the man had stooped, because the impression was deeper at the toe.   Between the time I discovered the tracks and when I fitted the shoes a cow or yearling had passed over the track and spoiled part of it.   I do not know when the man's track was made there.   I took the shoes back and put them on defendant, and started to Austin with him.   Met Sheriff White at Del Valle, and he and I and others came on to town with defendant and put him in jail.   Shoes and clothes were then taken off him.   Don't know whether they were given back to defendant afterwards or not.   (Shoes with mud signs on them shown witness, who identified them as the pair defendant had on when arrested, and which he fitted to the track in the water hole, and the mud signs on them, corresponding to the vamp and heel impression in the mud pointed out.)

State puts in evidence defendant's shoes.

Dr. J. T. Barnwell, for the State, testified, as follows:   I was called to see little Anna Straka on the night following Friday, March 30, A. D. 1893.   I arrived at her house about 1 a. m.   I found her badly hurt, and exhausted from loss of blood, excited, and nervously prostrated.   Her

private parts had been penetrated, and rudely entered.   The division between the vagina and the entrance to the rectum had been torn away, and both entrances torn into one.   It could have been done by a penis, but I can not say whether it was done by forcing something into the vagina or by tearing it out.   If it had been done with the penis, I should think the penis would have been bruised, but I would not say that it was absolutely necessary that the penis should be bruised, for the tissues, especially on children, are sometimes very weak.   As to whether it could be done with a penis, and as to whether the penis would have been bruised, I must say it would all depend upon the penis and its formation and condition; how far the skin came back behind the head of the penis.   I never examined defendant's penis.

R. E. White, for the State, testified as follows: (Witness handed map.) I was with the county surveyor, carrying the chain, when he surveyed the ground for the purpose of making said map.   I am well acquainted with the country and objects it pictures, and know it to be a substantially correct portrait of the scene of the rape and country and objects adjacent thereto.   It is in Travis County, Texas.

Jose Maria, for the State, testified as follows:   I live on the Cedar Creek road, opposite the field of Nichols, and between there and the rape, about 300 yards from the Nichols house.   I was at my house fasting, reading, and not working.   I am a Catholic, and that is one of our thanksgiving days, maybe you call it.   I mean we stay at home; do no work on that day.   It was Friday; we call it Good Friday.   I saw the little girl of Mrs. Straka come along between my house and field.   That was between 5 and 6 o'clock, near as I can tell.   I saw then a big negro man and two little ones plowing in the Nichols field.   After the little girl passed, the oxen of one of the little negroes ran away, and I looked out and could not see the big negro.   Don't know where he was, and don't know when he went away.   I did not see him any more that evening.

Cross-examined: I was at my house on the day spoken of.   Defendant and two boys were plowing in the Nichols field with oxen.   The team one of the boys was plowing with ran away.   I was standing in my door. I never looked for defendant particularly.   I saw him when I looked out once.   In a little while I looked out again, and I did not see him.   I did not tell Isaac and Bob Nichols and Mr. Volente that I looked out and did not see him, and then looked out in a little while and did see him.

Re-direct: I saw defendant and two boys in the field before the girl passed.   Did not see defendant in the field after the girl passed.   It was after 5 o'clock when I first missed defendant from the field, and it was between 5 and 6 o'clock when the little girl went by.   It was after the little girl went by that the oxen ran away.

R. E. White (the jury being withdrawn and absent from the court room), for the State, testified as follows:   Found defendant in custody

of Jim Fowler. I received him, and brought him to jail in Austin, Travis County, Texas. I had two conversations with him. The first time I talked with him, was in a hack, when I was bringing him to jail. I asked him if he knew he was under arrest, and he said yes. I asked him if he knew what he was charged with, and he said yes. I warned him that if he made any statement in reference to the commission of the offense, it could not be used for him, but could be used against him. Defendant then accounted for the blood on his pants by saying he had killed some rabbits the Thursday evening a week before Friday, March 30, A. D. 1893. I then brought him on and put him in jail. Sometime after this Mr. John Meredith, the jailor, came to me and said that Ed Nichols wanted to see me to make a statement. I went over to the jail, and had him brought out. I said, "You have been lying about this blood on your clothes; now if you want to tell me anything, tell me the truth." I told him further, that he need not make any statement unless he wanted to, and I did not care whether he made one or not. I further told him, that any statement he might make to me could not be used for him, and would be used against him. I offered him no inducement whatever to make a statement, nor did I make him any promise, nor did I use any force. My telling him he had been lying did not scare him, for he had sent for me to tell me the truth. I did not go over there to get a confession, but went because of the message delivered to me by Meredith. I used no persuasion, and the statement at that time made to me was voluntary.

Cross-examined: The first thing I said to defendant, when I went into the jail, was that he had been lying to me about the blood on his clothes. I did not tell him I had found out he was lying. Did not tell him if he did not tell me the truth they would hang him. I did not go at him in a way to influence him to make a statement. He had before accounted to me, in the first conversation, for the blood on his pants. He had said it was rabbit's blood. When I got Nichols' message, through Meredith, I then went over to the jail to hear the statement he might make. I did not tell him he would be hung or hurt, or anything like that done to him, if he did not confess to me. I will not swear I did not tell him it would be better for him to tell the truth, but I don't think I did. I told him if he told me anything, I wanted him to tell me the truth. I might have said it would be better to tell the truth, but don't think I did. I knew when I went over there that a statement made by him could not be used unless it was voluntarily made. I did not persuade him, hold out any hope for him, or scare him.

John Meredith (the jury having been withdrawn, and absent from the court room) testified as follows: Sometime after Mr. White had put defendant in jail, I went over to put him in a different cell and change his clothing, so as to preserve the clothes he was wearing when arrested.

While doing this, defendant made a statement to me about the blood on his clothes. He asked me to tell Mr. White to come over, and that he would tell Mr. White the whole truth about the matter. I finished what I went over to do, and then went and told Mr. White what defendant had told me, and Mr. White went over to the jail.

Ed Nichols (the jury having been withdrawn and absent from the court room), being examined by the court, testified as follows: I did not tell Mr. Meredith to tell Mr. White to come over to the jail, that I wanted to talk to him. They kept me down stairs in jail. Mr. White came over about 6 o'clock p. m. He asked me if I did that. I told him I did not. He told me it was best for me to tell the judge that I done it. I told him I didn't do it. When I came to town I told Mr. White how I got the blood on my pants. Mr. White tells the truth about that. Mr. White asked me, at the jail, if I did it. He said first, I want to talk to you. Asked me if I did it. I told him, no. He said it would be best for me to tell him I was guilty. I did not tell him I was guilty.

R. E. White, recalled: I didn't tell defendant that it would be better for him to tell the judge he did it. I didn't tell defendant it would be best for him to tell the judge he was guilty, or anything like it.

R. E. White (the jury having been returned into court) testified, for the State, as follows: I went to jail, and had conversation with defendant, in corridor of jail. I told him he had been lying to me about this matter. I went on to warn him as I did before. I warned him that any statement he might make to me could not do him any good, and would be used as evidence against him; and if he was going to tell me anything, I wanted him to tell me the truth. That I did not care whether he told me anything, unless he wanted to. I stopped then. Defendant told me he met this little girl. He asked her for some. She said he could get some at the house. That she laid down, and he got on her. That he never got it in her. She didn't cry or halloo, but whined all the time. That he got up and went off, and she got up and started towards home.

John Straka, for the State, testified as follows: I am the father of Anna Straka. November, 1892, she was 10 years old. I found her about sundown about one-fourth of a mile up just off the Cedar Creek road from where you turn off into the field to go to my house, and three-fourths of a mile down the road from the place she was raped. I found her as I was driving up the cows. When I found her she was calling, and could not walk. She was in her right mind.

Defendant's testimony consisted of an effort to prove an alibi; and, as to this defense, his own witnesses contradicted each other in several material respects. He endeavored to prove that the blood-stains found upon his clothing came from several rabbits that he had killed and cleaned sometime before the alleged rape.

*Walton & Calhoun,* for appellant.

*R. L. Henry,* Assistant Attorney-General, for the State.—Appellant relies upon only one point for a reversal of this cause. He contends, that the caption of the act in regard to rape, approved April 13, 1891, does not sufficiently state the object of the bill.

The State submits, that the object of the bill is clearly stated in the title, and there is nothing contained in the bill or amendment not stated in the caption. Const., art. 3, secs. 35, 36; Act April 13, 1891, p. 96, Gen. Laws; The State v. McCracken, 42 Texas, 383; Breen v. Railway, 44 Texas, 305; Tadlock v. Eccles, 20 Texas, 782; Giddings v. San Antonio, 47 Texas, 553; Albrecht v. The State, 8 Texas Cr. App., 220; Davis v. The State, 61 Am. Dec., 339; Rader v. Township, 39 N. J. Law, 509; People v. Bank, 67 N. Y., 572; Suth. Stat. Con., secs. 82–92; Wilson v. Spaulding, 19 Fed. Rep., 304; In Re Mayer, 50 N. Y., 507; Gillett v. McCarthy, 34 Minn., 318; Gilbert v. Belcher, 1 Bush, 145; The State v. Ransom, 73 Mo., 87; Suth. Stat. Con, secs. 85, 93; Davey v. Galveston County, 45 Texas, 298; Day Co. v. The State, 68 Texas, 542; Stone v. Brown, 54 Texas, 342; Mills v. Charleston, 29 Wis., 407; Murphy v. Menard, 11 Texas, 673; People v. McCallum, 1 Neb., 195; St. Louis v. Tiefel, 42 Mo., 592.

SIMKINS, JUDGE.—Appellant, a negro, was convicted of rape of a white girl between 10 and 11 years of age. His punishment was fixed at death, from which he appeals.

1. Appellant complains, that the court erred in permitting Sheriff White to detail the statements made to him by defendant, who was under arrest, and was not cautioned as required by law. There was no error. In his statements before the jury the witness shows that he had duly cautioned the defendant. The defendant did not deny this before the jury, or raise any issue before them as to its truth.

2. Appellant further complains, that the court erred in permitting Anna Straka, the injured girl, to testify, as she did not show that she understood the nature of an oath. There was no exception taken to the ruling of the court that the witness was competent. And we think from the answers of the witness she was clearly competent to testify.

3. The defense was an alibi, but the testimony to sustain it was not only weak and unsatisfactory, but signally fails to rebut the inculpatory facts.

The evidence clearly sustains the charge. The appellant, a large negro man, waylays and seizes the little girl as she was going along the road to her home in the evening, and finding her too young and small to successfully accomplish his purpose, uses his hand to assist him, and tears her

parts asunder.    When released, she crawls, bleeding and suffering, for three-quarters of a mile, where she is found by her father.    The punish-ment assessed is death.    The law is humane.

The judgment is affirmed.

*Affirmed.*

Judges all present and concurring.

### ON MOTION FOR REHEARING.

SIMKINS, JUDGE.—Appellant asks a rehearing, upon the grounds, first, that it was error to permit Sheriff White's testimony to go to the jury; second, that the Act of 1891, under which appellant was tried, is unconstitutional and void.

1. As to the first ground.   The record shows, that before Sheriff White was allowed to testify the jury were withdrawn, and the court investigated the circumstances under which the confession was made.   That appellant stated that he had not sent Meredith for Mr. White, but that Mr. White asked him if he was guilty, and told him it was best for him to tell the judge he was guilty, but that he had told Sheriff White that he had done nothing.   Mr. White denied this entire statement absolutely, and stated he had used no persuasion, promise, or force, and had cautioned him that what he said would be used against him, and could not be used for him.   On the jury being brought into court, Sheriff White was placed upon the stand, and testified substantially as he had stated it to the court.   The appellant did not take the stand or introduce any evidence before the jury in any way questioning the evidence of witness White.   Had he done so, it would have become the duty of the court to have instructed the jury to disregard the confession, if they believed that it had not been voluntarily made after being duly cautioned.   There was no error in admitting the testimony.

2. Appellant insists that this case should be reversed and remanded, upon the ground that the Act of April 13, 1891, changing the age of consent from ten to twelve years, is unconstitutional and void, in that the title to the act does not, in compliance with article 3, section 35, express the subject of the act.

The Twentieth Legislature passed an Act, approved February 25, 1887, more fully defining rape, under the following title: "An act to amend article 528, chapter 7, title 15, of the Penal Code."   The change made was extending the protection of the law to females so mentally diseased as to have no will.

The Twenty-second Legislature amended this act, by an amendatory Act, approved April 13, 1891, with the following title: "An Act to amend article 528, chapter 7, title 15, of the Penal Code of the State of

Texas, as amended by the Act of the Twentieth Legislature, approved February 25, 1887."

Article 3, section 35, of the Constitution, declares: "No bill (except appropriation bills) shall contain more than one subject, which shall be expressed in its title;" * * * and section 36, of same article, provides, that no law shall be revived or amended by reference to its title, but in such case the act revived or section amended shall be re-enacted and published at length.

The objection of appellant is, that the title of the amendatory Act of April 13, 1891, is fatally defective in not stating the subject of the amendment, to-wit, the definition of rape, "and it is not sufficient to merely state the article, chapter, and title of the Penal Code of Texas which the act purports to amend."

If there was ever any force in this objection, as applied to amendments of the Criminal Codes of Texas, it is now no longer an open question. Ever since the enactment of the Penal Code and Code of Criminal Procedure, successive Legislatures, with this provision or a similar one before them, have amended these codes by acts, the titles of which only gave the article, chapter, title, and name of the code sought to be amended.

They have recognized "the Penal Code" as a single act, designed to embrace all offenses against the laws, complete within itself, arranged and classified into titles, chapters, and articles, and have always deemed an amendment made as above stated was a sufficient compliance with the constitutional requirement, and sufficiently specified the subject sought to be amended by the act.

If, therefore, uniform legislative construction, supported by judicial decision and recognition, can settle anything, we must hold the title of the act in question to be sufficient.

It seems to be universally conceded, that the object of the constitutional requirement, that "an act should express the *subject* in its title," was to prevent the vicious legislation of uniting in the same bill incongruous matters, having no relation to or connection with each other, and germain to the subject of the bill as expressed in its title, operating as a surprise and fraud on the public and the Legislature itself, and facilitating the passage of bills engineered by private interests. Hence the necessity of stating in the title in what department of human affairs it proposed to act. Still the degree of particularity with which the title of an act should express the subject is not defined by the Constitution, and rests in the discretion of the Legislature, and when they act in the selection of a title, courts are not disposed to question its sufficiency.

The authorities, almost without dissent, agree that this constitutional provision should receive a most liberal construction, because to require precision would needlessly embarrass legislation. 4 Seld., 241; 19 N.

Y., 117; 50 N. Y., 564; 1 Neb., 194; Cool. Const. Lim., 174. Thus it is held, that if the title fairly gives notice so as to lead to inquiry, it is sufficient. 81 Pa. St., 438; 29 Wis., 407. And if the title be unmeaning as to purpose, yet distinct as to subject, it is sufficiant. 36 Barb., 192; 1 Neb., 194. In Texas, where this objection has been often urged against criminal and civil acts, the doctrine has been repeatedly laid down, in accord with the general current of authority, that the provisions of a statute are to be sustained as long as they are of the same nature and come legitimately under the general subject expressed in the title. Stone v. Brown, 54 Texas, 342; Giddings v. San Antonio, 47 Texas, 555; Breen v. Railway, 45 Texas, 306; Austin v. Railway, 45 Texas, 267; Albrecht's case, 8 Texas Cr. App., 216; Day Co. v. The State, 68 Texas, 542. In Gunter v. Texas Land and Cattle Company, 82 Texas, 503, it may be inferred that the court would have sustained the law had its title read, "An act to amend title 3, articles 9 and 10, of the Revised Statutes of Texas."

But the considerations that would require a more specific designation of subject in the title of an act apply almost entirely to civil matters, and have but little, if any, application to criminal law. Such law must be always general in its nature, affecting all alike. It can not be ex post facto, and can rarely be made the vehicle of private interest. While, therefore, it is true the constitutional provision controls both criminal and civil laws in their enactment or amendment, and the subject of every separate criminal act should be stated in its title, yet when criminal law is codified into a system, complete in itself, with a definite name fixed in the law itself, relating to one subject—crime—there could not, in reason, be a more distinct expression of the subject in the title of the act than a statement of the article, chapter, title, and name of the code to be amended.

In Hasselmeyer's case the very objection here considered was passed upon by this court, and the title of the amendatory act, which only read "An act to amend article 766 of the Penal Code," was held sufficient.

So in the McCracken case, 42 Texas, 385, in replying to the same objection, that the object of the amendatory act was not expressed in its title, Roberts, Chief Justice, says: "It (the Penal Code) has been amended continually ever since its adoption by referring to it in the titles of the amendatory acts as the Penal Code, not meaning thereby generally or a body of criminal laws in force in the State, but specially the Penal Code that was adopted as one act of the Legislature, approved August 26, 1856."

The motion for rehearing is overruled.

*Motion overruled.*

Judges all present and concurring.