

# THE ATTORNEY GENERAL
# OF TEXAS

WAGGONER CARR
ATTORNEY GENERAL

AUSTIN 11, TEXAS

Affirmed by ZM-84

June 7, 1963

Honorable Jerry Sadler
Commissioner of the General
  Land Office and Chairman
  of the School Land Board
Archives Building
Austin, Texas

Opinion No. C-90

Re: Whether moneys received from
    the sale of sand, gravel,
    marl and shell underlying
    state owned submerged lands
    should be placed in the Sand,
    Shell and Gravel Fund or in
    the Permanent Free School
    Fund; also, whether the Game
    and Fish Commission has the
    authority to petition the
    Corps of Engineers to refuse
    to grant submerged land oil
    and gas lessees of the State
    permits for structures to be
    placed on their submerged
    leases for oil and gas de-
    velopment and related question.

Dear Commissioner Sadler:

In a recent request for an opinion of this office, you present the following situation.

In 1941 the Legislature passed Article 5415a, V.C.S. (Acts 47th Legislature, 1941, Chapter 286, Page 454), and thereby placed the submerged lands of the State of Texas in the Permanent Free School Fund. However, in spite of this dedication of the submerged lands belonging to the State of Texas by the Legislature to the Permanent Free School Fund, the Game and Fish Commission[1] still sells sand, gravel, marl,

---

1.  The Game and Fish Commission was originally known as the Game, Fish and Oyster Commission. Upon H.B. 21, Acts 58th Legislature, 1963, Chapter ___, Page ___, becoming effective, the Game and Fish Commission will be combined with the State Parks Board and will be known thereafter as the Parks and Wildlife Commission. For the purpose of this opinion the Game, Fish and Oyster Commissioner, the Game, Fish and Oyster Commission and the Game and Fish Commission will be referred to as the "Game and Fish Commission."

shell and mudshell from these lands under the authority of Article 4053d, V.C.S., and places the moneys received from such sales in the special Sand, Shell and Gravel Fund for use generally by the Game and Fish Commission upon legislative appropriation.

You further, in effect, state in your opinion request that:

(1) The Game and Fish Commission claims the right to exercise control of the sand, gravel, marl, shell and mudshell on state owned submerged tidal lands.

(2) The Game and Fish Commission claims the right to supervise, control, and protect the fish, oyster, and wildlife on state owned submerged tidal lands, and as a result of the above claimed authority has in the past requested that the United States Corps of Engineers refuse to grant oil and gas lessees of the State of Texas who hold leases on state owned submerged tidal lands, authority to establish permanent structures on their submerged leases, thereby depriving them and the State itself of the right to recover the oil and gas that might underlie these leases. The Corps of Engineers communicates with the Game and Fish Commission in this respect apparently under authority of the provision contained in 72 Stat. 563, 16 U.S.C.A. 662.

In view of this situation, you in effect ask three questions in your request for our opinion.

You ask first, can the Game and Fish Commission legally deposit the proceeds received from the sale of sand, gravel, marl, shell and mudshell in the special Sand, Shell and Gravel Fund to be used primarily by the Game and Fish Commission instead of depositing said proceeds to the Permanent Free School Fund since the submerged lands of the State were placed in the Permanent Free School Fund by Article 5415a, V.C.S.?

You ask second, does the Game and Fish Commission have the authority to petition the Corps of Engineers to refuse to grant to State submerged land oil and gas lessees permits for structures to be placed on their submerged leases for development under their oil and gas lease?

You ask third, does the Corps of Engineers have the legal right to withhold the granting of a permit for permanent structures such as required to develop the state owned submerged lands for oil and gas if such structures

are determined by the Corps of Engineers to be in no way a hindrance to navigation?

## I.

In 1939 the Legislature passed Article 5421c-3, V.C.S., Acts 46th Legislature, Chapter 3, Page 465. This act dedi-cated the "mineral estate" within tidewater limits, including islands, lakes, bays and the bed of the sea, belonging to the State of Texas, to the Permanent Free School Fund. The question immediately arises, are sand, gravel, marl, shell and mudshell "minerals" so as to constitute a part of the mineral estate dedicated to the Permanent Free School Fund by Article 5421c-3, V.C.S.?

We believe that the Legislature used the words "mineral estate" in their ordinary and natural meaning. In the case of Heinatz v. Allen, 147 Tex. 512, 217 S.W.2d 994 (1949), the Supreme Court in construing a will which provided that the surface rights exclusive of the minerals were to be devised to one party and the mineral rights were to be devised to a trustee for other parties, held that the words "mineral" and "mineral rights" were to be interpreted according to their ordinary and natural meaning in the absence of anything in the will manifesting an intention on the part of the testatrix which would indicate said words were used in a scientific or technical sense. The Court went on to say that scientifically the word "mineral" included sand, gravel and limestone, but ordinarily the word "mineral" did not include sand, gravel and limestone unless these substances were of such an exceptional character so as to give them special value. We quote from the Court at page 997:

> "In our opinion substances such as sand, gravel and limestone are not minerals within the ordinary and natural meaning of the word unless they are rare and exceptional in character or possess a peculiar property giving them special value, as for example sand that is valuable for making glass and limestone of such quality that it may profitably be manufactured into cement. Such substances, when they are useful only for building and road-making purposes, are not regarded as minerals in the ordinary and generally accepted meaning of the word."

We find nothing contained in Article 5421c-3, V.C.S., to indicate that the Legislature intended to use such words

in other than their ordinary meaning. Nor do we find any other legislative acts current at the time of the passage of Article 5421c-3 which would indicate the Legislature had intended to use these words other than in their ordinary sense. Therefore, for the reason given above and for the reasons that follow in discussing Article 5415a, V.C.S., we conclude that common sand, gravel, shell and mudshell of no exceptional or special value were excluded from the dedication to the Permanent Free School Fund made by Article 5421c-3.

In 1941 the Legislature passed Article 5415a, V.C.S., (Acts 47th Leg., 1941, Chapter 286, Page 454). This Act "set apart" and "granted" to the Permanent Free School Fund, the "lands" of the Gulf of Mexico and its arms covered by water at either high or low tide within the boundaries of Texas.

Article 5415a reads in part:

"The State of Texas owns, in full and complete ownership, the waters of the Gulf of Mexico and of the arms of the said Gulf, and the beds and shores of the Gulf of Mexico, and the arms of the Gulf of Mexico, including all lands that are covered by the waters of the said Gulf and its arms, either at low tide or high tide, within the boundaries of Texas, as herein fixed; and that all of said lands are set apart and granted to the Permanent Public Free School Fund of the State, and shall be held for the benefit of the Public Free School Fund of this State according to the provisions of law governing the same."

Certainly the term "land" would ordinarily include all substances of which it is composed including sand, gravel and shell. Black's Law Dictionary, 3rd Ed.; Webster's International Dictionary, 2d Ed.; 73 C.J.S. p. 163, Property 7.

On its face no apparent ambiguity exists in the wording of this statute. However, a latent ambiguity develops in interpreting Article 5415a in view of Articles 4051, 4052, 4053 and 4053d, V.C.S., in that said later mentioned acts deal with the specific substances, "sand," "gravel" and "mudshell," which is embraced in the submerged lands and areas covered by Article 5415a.

By Acts 36th Leg., 2d Called Session 1919, Chapter 74, Page 215 (codified as Article 4051, V.C.S.), the Legislature placed all sand of commercial value and all of the shells, mudshells or gravel of whatsoever kind that may be in or upon any island, reef or bar, and in or upon the bottoms of any lake, bay, shallow water, rivers, creeks and bayous and fish hatcheries and oyster beds within the territory therein defined, under the control, management and protection of the Game and Fish Commission. The territory defined included all the islands, reefs, bars, lakes and bays within tidewater limits from the most interior point seaward coextensive with the jurisdiction of this State.

By Acts 36th Leg., 2d Called Session 1919, Chapter 74, Page 215 (codified as Article 4052, V.C.S.), the Legislature invested the Game and Fish Commission with all power and authority necessary to carry into effect the provisions of the chapter and likewise gave it full charge and discretion over all matters pertaining to the sale, taking, carrying away or disturbing of sand or gravel of commercial value, and all gravel, shells, mudshell and oyster beds.

By the aforementioned Act, Section 5 thereof (codified as Article 4053, V.C.S.), anyone desiring to purchase gravel, shells, or mudshell included in this chapter, or operate in or upon any island, reef, bar, lake, bay, river, creek or bayou must apply for a permit to do so from the Game and Fish Commission.

By Acts 39th Leg., Chapter 183, Page 422 (codified as Article 4053d, V.C.S.), the Game and Fish Commission with approval of the Governor may sell gravel, sand, shell or mudshell included in the Act for not less than 4¢ a ton. The proceeds are to be credited by the treasurer to a Special Fund known as the Sand, Shell and Gravel Fund. Such fund is subject to legislative appropriation for enforcement of the provisions of the Sand, Shell and Gravel Laws and for the establishment and maintenance of fish hatcheries.

The question presented by this ambiguity resolves into a proper construction of Article 5415a (1941) in light of the prior enactments (Articles 4051-4053d, 1925 and prior), since no express repeal of any prior acts is contained in Article 5415a. Stated another way, did the Legislature intend to exclude sand, gravel and mudshell from the dedication effectuated by Article 5415a or did the Legislature intend to dedicate every component of the land included in the area described in Article 5415a to the Permanent Free School Fund? We must determine the legislative intent, for that is the law. 39 Tex. Jur. 167, Statutes, § 90.

A rule of statutory construction employed as an aid in determining legislative intent which we feel is applicable to the instant question is stated in 39 Tex.Jur. 150, Statutes, § 81 as follows:

"The enactment of a general law does not ordinarily operate as a repeal of a particular or special law, by implication, although both relate to the same subject matter. On the contrary, both statutes are permitted to stand, and the general law is applicable to all cases not embraced by the specific act. In other words the particular act is construed as constituting an exception to the general law. This is said to be a settled rule of construction, based upon the presumption that a specific statute evidences the intention of the Legislature more clearly than a general one, and therefore should control."

To the same effect are: Flowers v. Pecos River Ry. Co., 138 Tex. 18, 156 S.W.2d 260 (1941); Fortinberry v. State, Tex. ___, 283 S.W. 146 (1926); Hollum v. Texas Liquor Control Board, 166 S.W.2d 175 (Tex.Civ.App. 1942); 1 Sutherland, Statutory Construction, 3rd Ed., pages 486, 2021.

We believe that Articles 4051-4053d, V.C.S., fall within this quoted exception. Effect must be given to these articles if possible. It is entirely possible for Article 5415a and Articles 4051 through 4053d to stand together. Sand, gravel and mudshell are specific subjects of legislation whereas under Article 5415a, "land" is a general subject. Land includes all of the materials of which it is composed, including in many instances, sand, gravel and mudshell. Applying the exception, i.e. that a general act does not repeal a special act by implication, sand, gravel and mudshell would be excluded from the land dedicated to the Permanent Free School Fund by Article 5415a.

Our view is further substantiated by the rule that an executive or departmental interpretation of an ambiguous or uncertain statute will be given great weight by the judiciary. 39 Tex.Jur., page 235, Statutes 126; 2 Sutherland, Statutory Construction, 3rd Ed., page 516, 5105.

In the instant matter the Game and Fish Commission has continued to issue permits and to sell sand, gravel and mudshell in tidelands and Gulf areas and to deposit the proceeds with the State Treasurer. (The office of Game, Fish and Oyster Commissioner was superseded by the Game, Fish and

Oyster Commission, 978F, V.P.C. In turn the Game, Fish and Oyster Commission was superseded by the Game and Fish Commission, 978F-3, V.P.C. The duties remain substantially the same.) The Governor has continued to approve sales of sand, gravel and mudshell as required by Article 4053d. Authorized operations of the Commission have been paid for from the sand, shell and gravel fund. The State Treasurer has continued since the passage of Article 5415a to credit the proceeds from the sale of sand, shell and gravel to the Special Sand, Shell and Gravel Fund created under Article 4053d. (Sand, Shell and Gravel Fund was changed to the Special Game and Fish Fund in 1947 by Article 4386b, V.C.S.) The Comptroller has continued to issue his warrant on the State Treasurer for payments as authorized out of said Fund. These departmental interpretations of Article 5415a and Articles 4051-4053d, in our opinion, should be given great weight. Such interpretations indicate a belief on the part of the Commissioners and State officers involved that sand, gravel and mudshell were excluded from the appropriation effected by Article 5415a.

That the Legislature intended to treat sand, shell and gravel separately and as excluded from the meaning of Article 5415a is further evidenced by the fact that the Legislature in its 1941 appropriation bill, Acts 47th Leg., 1941, Chapter 571, page 1114, at paragraph 1158, appropriated moneys from the sand, shell and gravel fund for purposes provided under Article 4053d. Thus the State Legislature that passed Article 5415a continued to treat sand, gravel and mudshell as though it were excluded from the appropriation to the Permanent Free School Fund under Article 5415a. A construction made by the same Legislature in another act has great weight, if not controlling effect as plainly showing the legislative intent in the passage of the act under consideration. 39 Tex.Jur., page 239, Statutes 127.

For the reasons stated above, we are of the opinion and so advise you that sand, gravel and mudshell within tidewater limits and the Gulf of Mexico within the boundaries of Texas are not dedicated to the Permanent Free School Fund and constitute no part of that fund. There exists no constitutional provision which prohibits the Legislature from enacting laws for the sale of the sand, gravel and mudshell in tideland areas and the Gulf of Mexico within the boundaries of Texas and disposing of the proceeds of such sales as it may deem proper.

## II.

Since the Game and Fish Commission is but an agency of the State of Texas created by the Legislature of the State to perform functions delegated to it by that same Legislature, it is necessary, in order to answer your second question, to examine those statutes under which the Game and Fish Commission has purported to act when petitioning the Corps of Engineers to refuse permits to lessees of the State for erection of structures reasonably necessary to develop said lessees' tidal submerged land oil and gas leases and compare them with the statutes providing for the sale of oil and gas from State owned submerged lands.

The first act passed by the Legislature of the State of Texas relating to the sale and/or removal of sand, gravel, marl and shell from the State owned submerged lands was passed in 1911. Acts 32nd Leg., 1911, R.S., Chapter 68, Page 118. In 1919 the Legislature amended all nine sections of Chapter 68 of Acts of 32nd Legislature, R.S., above mentioned, the first seven sections of the amending act being in substantially the same form and with the same contents as when originally passed. Acts 36th Leg., 1919, First C.S., Chapter 74, Page 215. Section 1 of the Act of 1911 and of the Act of 1919 corresponds to Article 4051, V.C.S.; Section 3 of the Act of 1911 and 1919 corresponds to Article 4052, V.C.S.; Section 5 of the Act of 1911 and 1919 corresponds to Article 4053, V.C.S.; and Section 6 of the Act of 1911 and 1919 corresponds to Article 4053d, V.C.S.

In 1913 the Texas Legislature passed an Act providing for mineral leases on State owned tidal submerged lands. Acts 33rd Leg., 1913, R.S., Chapter 173, page 409. This Act was amended in its entirety in 1917. Acts 35th Leg., 1917, R.S., Chapter 83, page 158. In 1919 the previous act of 1917 dealing with the sale of oil and gas leases on State owned submerged lands was repealed by the 36th Legislature and a new statute was enacted providing for the sale of oil and gas leases on State owned submerged lands. Acts 36th Leg., 1919, First C.S., Chapter 19, page 51. This Act was codified as Articles 5353-5366, R.C.S. of 1925.

Chapter 19 (oil and gas) was passed by the Legislature on July 21, 1919. Chapter 74 (sand, gravel, marl and shell) was passed by the Legislature on July 22, 1919. The House of Representatives actually passed both bills (Chapter 19 and Chapter 74) on the same day--July 21, 1919. Obviously, these two bills passed by the same Legislature, dealing with the same subject matter (i.e., operations in State owned

submerged lands as such operations might affect aquatic life and the bottoms of such lands) and enacted almost simultaneously must be considered in pari materia and construed together as one Act.  Southern Pacific Company v. Sorey, 104 Tex. 476, 140 S.W. 334 (1911); McGrady v. Terrell, 98 Tex. 427, 84 S.W. 641 (1905); Austin v. Gulf, Colorado and Santa Fe R.R. Co., 45 Tex. 234 (1876); 39 Tex.Jur. 258, Statutes, § 137; 39 Tex.Jur. 253, Statutes, § 135.

Insofar as our current problem is concerned, an examination of Chapters 19 and 74, Acts 36th Legislature, reveals that the intention of the Legislature in passing Chapter 19 was to provide for the sale of oil and gas leases on state owned tidal submerged lands (i.e., lands owned by the State of Texas which are submerged under waters that are subject to the rise and fall, and ebb and flow of the tide) and to provide for the protection of aquatic life in the waters of the leased areas when said areas might be developed for oil and gas.

The intention of the Legislature in passing Chapter 74 was to provide for protection to aquatic life inhabiting the tidal waters of the State generally when sand, gravel, marl, shell and mudshell are removed from these waters and to provide for the sale of sand, gravel, marl, shell and mudshell underlying the tidal waters of the State.  Insofar as the State might protect navigation in navigable waters of the State, it was the intent of the Legislature that Chapter 74 authorized the Game and Fish Commissioner to do so when sand, gravel, marl, shell and mudshell might be removed from such navigable waters of the State (Section 5 of Chapter 74).

It seems clear beyond question that the Legislature of 1919 did not intend that an oil and gas lessee of state owned tidal (submerged) lands should acquire a permit from the Game and Fish Commission before he could develop his lease for oil and gas.  Section 1 of Chapter 19 (codified as Article 5353, V.C.S.) authorized the Land Commissioner to sell oil and gas leases on state owned tidal (submerged) lands, and Section 10 of Chapter 19 (codified as Article 5366, V.C.S.) authorized the Land Commissioner to make rules for development of State tidal (submerged) leases for oil and gas so as not to unduly damage aquatic life in these waters.  Section 10 reads:

"Sec. 10.  The development of wells and the development and operation upon the areas included herein shall be done so far as practicable in such manner as to prevent such pollution of

the water as will destroy fish, oysters and other
sea food and it shall be the duty of the Game,
Fish & Oyster Commissioner to enforce such rules
and regulations as may be prescribed for that
purpose by the Commissioner of the General Land
Office."

Surely, had the Legislature intended that the owner of
an oil and gas lease on state owned tidal (submerged) lands
acquire permits from the Game and Fish Commission before the
lessee might develop his lease, it would never have enacted
Section 10 of Chapter 19 and made this section a part of
these two chapters. If the Legislature had intended that
the Game and Fish Commission should have exclusive authority
to protect the aquatic life in tidal waters, Section 10 would
be superfluous and would not have been included in the en-
actments. Section 10 would be unnecessary to effectuate the
Legislative intent. If the Legislature had intended that the
Game and Fish Commissioner should exercise joint control
through the authority to make rules and regulations with the
Land Commissioner over the protection of aquatic life within
the areas of State owned tidal submerged lands leased for
oil and gas, the Legislature would have logically provided
for the Land Commissioner, in conjunction with the Game and
Fish Commission, to promulgate joint rules and regulations
for such protection instead of passing the Act as it did.
The Land Commissioner and the Game and Fish Commission
would then have acted as a Board, if such had been the Legis-
lative intent, for the promulgation of rules to protect
aquatic life in tidal waters. But, obviously, the Legisla-
ture did not choose to provide for such joint action. Con-
sequently, it must have been the legislative intent that
insofar as protection of aquatic life and oyster beds was
concerned which were located within State owned tidal areas
leased for oil and gas and under development for such that
the establishment and promulgation of rules and regulations
for the protection of such aquatic life and oyster beds was
to be in the Land Commissioner only.

Such a view as we have expressed above is in complete
accord with the rule of statutory construction expressed in
39 Tex.Jur. 212, Statutes, § 114 and which reads as follows:

"In case of conflict between a general pro-
vision and a special provision dealing with the
same subject, the former is controlled or limited
by the latter; and this is so whether the pro--
visions in question are contained in the same act
or in different enactments. In other words, when

a statute makes a general provision apparently
for all cases and a special provision for a
particular case or class, the former yields and
the latter prevails insofar as the particular
case or class is concerned."

The following cases are to this same general effect.
Howard Oil Company v. Davis, 76 Tex. 630, 13 S.W. 665 (1890);
Scoby v. Sweatt, 28 Tex. 713 (1866); Perez v. Perez, 59 Tex.
322 (1883). In the instant case, the Legislature has con-
sidered the tidal areas leased for oil and gas and being
developed therefore as the specific, and has provided for the
protection of aquatic life and oyster beds in such areas in a
different manner than it has provided for the protection of
aquatic life in tidal waters, generally. Applying the above
cited rule to these enactments, the Legislature did not in-
tend that a lessee for oil and gas on State owned tidal
(submerged) lands acquire a permit from the Game and Fish
Commission to develop his lease.

If it be contended that insofar as the protection of
navigation in state tidal waters is concerned, that the
Legislature intended by enacting Chapter 74 to place such
protection in the Game and Fish Commission even over areas
under oil and gas lease and being developed therefor, such
a contention was quashed by the 54th Legislature in 1955
when it amended Article 5366 and omitted the phrase, "and it
shall be the duty of the Game, Fish & Oyster Commissioner
to enforce such rules and regulations as may be prescribed
for that purpose by the Commissioner of the General Land
Office," and expressly placed the protection of navigation
in areas under oil and gas lease and being developed there-
for under the jurisdiction of the Land Commissioner. Article
5366, V.C.S., now reads:

"All development and operations upon the
areas included herein shall be done so far as
practicable in such manner as to prevent pollu-
tion of water, destruction of fish, oysters and
other marine life, and obstruction of naviga-
tion. The Commissioner of the General Land
Office shall promulgate and enforce such rules
and regulations as may be necessary for that
purpose. All such rules and regulations and any
alterations of such rules shall be submitted to
the Attorney General of this State for his written
approval prior to the time such rules and regula-
tions or alterations of the same shall become
effective."

Consequently, insofar as the protection of aquatic life and navigation in State owned tidal waters is concerned when the area in question is under oil and gas lease and permits are being sought from the Corps of Engineers, the Land Commissioner is responsible for such protection, not the Game and Fish Commission. Insofar as the Game and Fish Commission might have relied on its general authority to protect aquatic life and navigation in State owned tidal waters, which were being developed for oil and gas under a State lease, to contend that tidal lease owners should acquire a permit from said Game and Fish Commission or that the Game and Fish Commission has the authority to petition the Corps of Engineers to refuse to grant to State submerged land oil and gas lessees permits for structures to be placed on their submerged lease for development under their oil and gas leases, it has erred.

Still another possibility exists which the Game and Fish Commission might believe is authority for its action in attempting to force State tidal lessees to acquire permits from it before developing lands for oil and gas. Chapter 74, Acts 36th Legislature, and its subsequent amendments do require that anyone desiring to remove or disturb any sand, gravel, marl, shell or mudshell from tidal waters acquire a permit from the Game and Fish Commission.

When the Legislature passed on Chapters 19 and 74, it was aware that generally an oil and gas lessee when he buys an oil and gas lease acquires the dominant estate in the leased property. Joyner v. Dearing & Sons, 112 S.W.2d 1109 (1937); Joyner v. Dearing & Sons, 134 S.W.2d 757 (1939, error dism., judgment correct); Pitzer & Wert v. Williamson, 159 S.W.2d 181 (1942, dism. w.o.j.). Also the grant of an oil and gas lease impliedly grants to the lessee the easements and such usage of the surface of the land as are reasonably necessary to fulfill the purpose of the grant. Gregg v. Caldwell-Guadalupe Pick-up Stations, 286 S.W. 1083 (Comm.App. 1926); Donnell v. Otts, 230 S.W. 864 (Tex.Civ.App. 1921).

Being aware of the attributes of an oil and gas lease, it is unrealistic to attribute to the Legislature an intention to provide for the grant of an oil and gas lease covering tidal (submerged) lands to a party which lease would carry with it the implied right to utilize the surface estate so as to reasonably develop the lease for oil and gas and at the same time to provide a method or means by which such grant might be thwarted. This would certainly be the case if the Game and Fish Commission could have required an oil and gas lessee of the State to get a permit to disturb the sand, gravel, marl, shell and mudshell necessary

to develop his lease and should have at the same time thought that the State would have been better served by the sale of the particular sand, gravel, marl, shell or mudshell necessarily disturbed in such oil and gas development rather than by the development of the lease for oil and gas. Clearly, it was not the intent of the Legislature to pass an Act making a grant that would have given the Game and Fish Commission authority to prohibit the very thing granted.

However, if any doubt existed as to the legislative intent regarding the necessity of developers of oil and gas leases on State owned tidal lands to acquire permits from the Game and Fish Commission before developing such tracts, these doubts are now resolved by the action of the 58th Legislature in passing House Bill No. 161, thereby upon its becoming effective, amending Article 4053, V.C.S., so as to make it read in part as follows:

"Section 5. Nothing in this chapter shall be construed to require any lessee of an oil and gas lease, which has heretofore or may hereafter be executed by the State, to obtain a permit from the Parks and Wildlife Commission to exercise the rights granted said lessee under said lease in the provisions of the applicable laws of the State of Texas."

For reasons given above, it seems obvious that the Legislature of the State has not intended that State owned tidal (submerged) lands leased for oil and gas should be subject to any demands of the Game and Fish Commission insofar as oil and gas development work is concerned.

Therefore, the answer to your second question is no. The Game and Fish Commission does not have authority to petition the Corps of Engineers to refuse to grant to oil and gas lessees on State owned tidal or submerged lands permits for structures necessary to develop the submerged leases for oil and gas. The Commission does not have the authority to do indirectly what it cannot accomplish directly.

However, insofar as sand, gravel, marl, shell and mudshell might be removed and sold from State owned tidal or submerged lands under lease for oil and gas without disturbing or interfering with the development of the leased lands for oil and gas, the Game and Fish Commission is authorized to issue permits for the sale thereof. (See Attorney General's Opinion WW-150.)

### III.

We do not answer your third question because it is outside of the scope of the duties of the Office of Attorney General to advise State agencies through official opinions as to the duties of Federal agencies.

However, we are of the opinion that insofar as the United States Corps of Engineers is concerned, they will respect the State agency or officer authorized to speak on the protection of wild and aquatic life in the State owned areas in question (i.e., the Commissioner of the General Land Office in State owned tidal or submerged areas under lease for oil and gas and not the Game and Fish Commission).

### SUMMARY

The Game and Fish Commission can legally deposit the money received from the sale of sand, gravel, marl, shell and mudshell from State owned tidal or submerged lands in the special Sand, Shell and Gravel Fund, said fund being subject to appropriation by the Legislature.

The Game and Fish Commission lacks authority to petition the United States Corps of Engineers or any other federal agency to refuse to grant to the owner of oil and gas leases on state owned tidal or submerged lands permits for structures to be placed on their leases for development thereof.

An answer to your third question is outside of the scope of an official Attorney General's opinion.

Yours very truly,

WAGGONER CARR
Attorney General of Texas

By Milton Richardson
Milton Richardson
Assistant

MR:da

APPROVED:

OPINION COMMITTEE
W. V. Geppert, Chairman

Mary K. Wall
Ben Harrison
Malcolm Quick

APPROVED FOR THE ATTORNEY GENERAL
BY:  Stanton Stone